Makovsky Bros., Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 6, 1980, before Judges WILKINSON, JR., MACPHAIL and WILLIAMS, JR., sitting as a panel of three.

*Sandor Engel,* for petitioner.

*R. Knickerbocker Smith, Jr.,* Assistant Counsel, with him *John G. Alford,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

OPINION BY JUDGE WILLIAMS, JR., December 18, 1980:

In this appeal common carrier Makovsky Bros., Inc. (Makovsky) seeks review of a corrected order of

the Pennsylvania Public Utility Commission (PUC) directing Makovsky to cease and desist from using its certificated vehicles in furtherance of its private ''buy-sell'' business operations.

Since about 1932 Makovsky has engaged in the business of buying and selling building materials. In June 1977 the PUC issued to Makovsky a certificate of public convenience to operate as a common carrier by motor vehicle. Under Makovsky's certificate it was authorized to transport certain building materials between points not exceeding 25 miles from point of origin to point of destination, in Lehigh, Northampton and certain other counties, but not including Philadelphia County. In addition to its operations as a certificated common carrier Makovsky continued in its private business of buying and selling building materials, including slag.

It is undisputed that on October 18, 1977, a PUC investigator stopped one of Makovsky's certificated trucks on a public highway in Northampton County, and the truck was carrying about 48,000 pounds of slag which Makovsky had purchased from the Bethlehem Mines Corporation in Northampton and Lehigh counties. It is also undisputed that the common carrier was in the process of transporting the slag to the American Slag Company in Philadelphia County, pursuant to a contract of sale.

Based on those facts, the PUC in June 1978 issued a complaint against Makovsky, charging the carrier with three infractions of the Public Utility Law,[1] including a violation of Section 202 by rendering ser-

---

[1] Act of May 28, 1937, P.L. 1053, §§1 et seq., as amended, 66 P.S. §§1101 et seq. That Act was repealed by the Public Utility Code, 66 Pa. C. S. §§101 et seq., enacted July 1, 1978, to take effect in 60 days from that date.

vice to a territory different than that authorized by its certificate of public convenience.[2]

After a hearing, an Administrative Law Judge entered an Initial Decision on January 19, 1979, by which the PUC complaint was sustained and Makovsky ordered to cease and desist from using its certificated vehicles for its private "buy-sell" operations. Makovsky filed exceptions with the PUC from the Initial Decision.

Upon denying the exceptions, the PUC on June 13, 1979, entered an order sustaining the complaint, but only as to the charge of rendering service to a territory beyond the scope of the carrier's certificate. Based on that determination the PUC issued a cease and desist order which, on its face, purported to enjoin Makovsky from conducting *any* "buy-sell" operations.

However, during the pendency of the present appeal the PUC corrected its order: Makovsky was only enjoined from *using its certificated vehicles* in the conduct of the "buy-sell" operations. It is the cease and desist order as corrected that is before this Court.

It must be noted that the act which started this case, the use of the certificated truck for the "buy-sell" transaction, occurred on October 18, 1977, prior to the effective date of the "new" Public Utility Code, 66 Pa. C. S. §101 *et seq.* The violations alleged arose under the former Public Utility Law; and, the complaint against Makovsky was drafted in terms of the former statutory provisions.

---

[2] 66 P.S. §1122. By force of subsection (c) of Section 202 it was unlawful for any public utility to "begin the exercise of any additional right, power, franchise, or privilege" without commission approval. The complaint also charged violation of Section 201, 66 P.S. §1121, for rendering service for compensation without a certificate, and violation of Section 804, 66 P.S. §1304, for operating as a contract carrier without a permit.

However, the cease and desist order here in issue was entered by the PUC after the effective date of the Public Utility Code; and that order was stated in terms of the Code.[3] Specifically, the PUC order declared Makovsky's litigated conduct to be a violation of Section 1102 of the "new" Public Utility Code,[4] instead of a violation of Section 202 of the former Public Utility Law. Because a cease and desist order aims prospectively, the tenor of the order in this case was to enjoin the continuation of conduct which the PUC deemed a violation of the express terms of the statute in force on the date of the order.

By the terms of Section 1102(a)(1) of the Public Utility Code, for any existing public utility to lawfully render or furnish "service of a different nature or to a different territory" than that authorized by its certificate of public convenience, the utility must first obtain the approval of the PUC. There is no dispute that common carrier Makovsky is a "public utility." In the instant case the crucial element of Section 1102(a)(1) is the word "service." For, it is the rendition of *service* beyond the scope of the utility's existing certificate that requires PUC approval.

Makovsky argues that the use of its certificated vehicles to further its slag "buy-sell" activities is not subject to the strictures of its existing certificate or proscribed by the Public Utility Code. The premise of that argument is the carrier's assertion that such use of the vehicles did not constitute rendering a "service" within the meaning of the Code. In sum, Makovsky argues that because it owned the slag by purchase and was thus transporting its own property,

---

[3] Such procedure is expressly authorized by Section 103(b) of the Public Utility Code, 66 Pa. C. S. §103(b).

[4] 66 Pa. C. S. §1102.

it had a liberty to transport it without PUC approval and certification.

The concept of "service" under the Public Utility Code is given definition in Section 102.[5] That Section reads in pertinent part as follows:

'Service.' Used in its broadest and most inclusive sense, includes any and all *acts done,* rendered, or performed, and any and all *things furnished* or supplied, and any and all *facilities used,* furnished, or supplied by public utilities ... *in the performance of their duties* under this part to their patrons ... and the public ... (Emphasis added.)

Under the above defnition, the concept of "service" encompasses not just acts of performance or rendition to the patrons of a utility's certificated operations but also includes the *things* and *facilities* for such performance.

The term "facilities" contained in the above definition of "service" is itself separately defined by Section 102 to include:

All the *plant and equipment* of a public utility ... and any and all *means and instrumentalities in any manner owned,* operated ... *furnished or supplied for, by, or in connection with, the business of any public utility.* (Emphasis added.)

In terms of Section 102, it is clear that Makovsky's trucks, being certificated vehicles, represented equipment, means or instrumentalities owned, used, furnished for, or in connection with, its business as a public utility. The trucks were "facilities" dedicated to the performance of Makovsky's duties to its patrons and public under its certificate of public con-

---

[5] 66 Pa. C. S. §102.

venience. As such, the trucks were part of the "service" which Makovsky furnished or dedicated to its certificated scope of operations. Therefore, when the common carrier in this case lent its "facilities" to the delivery of materials in Philadelphia County, it was furnishing a "service" to a territory different than that authorized by its certificate of public convenience. A part of the "service" furnished for one territory was being shared with another territory. Going beyond the definitional plane, Makovsky was in a very real sense offering or furnishing a transportation service to the American Slag Company in Philadelphia County, when the carrier committed its certificated truck to bring to that customer the slag it wanted.

It is useful to note and consider the "old" case of *York Motor Express v. Public Service Commission;* 96 Pa. Superior Ct. 174 (1929). Although the *York Motor Express* case was decided under a predecessor statute, it can be read as deciding an issue at least related to the one at bar: the use of certificated vehicles for the private carriage of property.

In *York Motor Express* the carrier had a certificate to transport merchandise from certain points in York County to Philadelphia. However, the carrier was not authorized to transport from Hanover, also in York County, to Philadelphia. Notwithstanding the limitations of its certificate, the carrier had private contracts with two particular shippers in Hanover to transport their merchandise to Philadelphia. To serve those private shippers, the carrier picked up the merchandise in Hanover with its certificated vehicles and then went to an authorized geographic point to pick up additional freight also destined for Philadelphia. Both loads were shipped on the same truck. In short, the same transportation facilities were used to serve both the certificated common

carriage of property and the private carriage of property.

In the *York Motor Express* case the Superior Court affirmed the Commission's cease and desist order against the carrier's act of using its certificated facilities for the contemporaneous transport of property pursuant to private contracts of carriage. The Superior Court declared that the law never contemplated such a "dual capacity." The Court held that a carrier cannot be *both* a common carrier and a private carrier at the same time with the same facilities. *Accord, Hubert v. Public Service Commission,* 118 Pa. Superior Ct. 128, 180 A. 23 (1935).

On its narrow facts *York Motor Express* involved the carrier's conduct of combining, on a certificated vehicle, goods shipped by private carriage with those shipped pursuant to common carriage operations. However, a close consideration of the case reveals an additional concern on the part of the Superior Court: the carrier was attempting to "extend its rights" and put its *certificated vehicles* in service between points not authorized by its certificate of public convenience. That was the effect of the carrier's conduct in *York Motor Express;* and, that was the effect of Makovsky's conduct in the case at bar. It is well established that a certificate of public convenience may not be enlarged by *ex parte* action on the part of the holder thereof. *T. M. Zimmerman Co. v. Pennsylvania Public Utility Commission,* 195 Pa. Superior Ct. 77, 87, 169 A.2d 322, 326 (1961); *Marmer v. Pennsylvania Public Utility Commission,* 190 Pa. Superior Ct. 436, 443, 154 A.2d 262, 266 (1959).

As a final argument, appellant Makovsky asserts that the definition of "common carrier by motor vehicle" contained in Section 102 of the Public Utility Code exempts its "buy-sell" carriage from

the restraints of Section 1102(a)(1) of the Code. Specifically, the appellant refers to the portion of that definition which excludes from its compass the following activity:

> (5) Transportation of property by the owner to himself, or to purchasers directly from him, *in vehicles* owned and operated by the owner of such property and *not otherwise used in transportation of property for compensation for others.* (Emphasis added.)

In order for the above definitional exclusion to have any operation in any case, the vehicles involved must be ones "not otherwise used in transportation of property for compensation for others." That is, the exclusion cannot apply as to certificated vehicles already dedicated to the performance of a carrier's duties to its patrons and public under a certificate for common carriage. In such circumstances the vehicles *are* "otherwise used in transportation of property for compensation for others." Accordingly, there is nothing in the Code's definition of a "common carrier by motor vehicle" which exempts Makovsky's conduct from the restraints of Section 1102(a)(1) of the Code.

Whatever "gloss" the PUC may in the past have put on the *York Motor Express* case and related decisions, in interpreting the predecessor statute, that past agency reading of a prior law cannot be a controlling force in the matter before us. Aside from not being binding on this Court, the past legal interpretations of the PUC do not preclude the agency from reinterpreting the law in light of current conditions. Further, in the instant case the PUC had before it a "new" statutory scheme which clearly and expressly treats the extension of service by an existing utility beyond the scope of its certificate.

In reviewing orders of the PUC, this Court is limited to a determination of whether constitutional rights have been violated, an error of law committed, or if there is a lack of substantial evidence to support the findings, determination or order of the PUC. *E.g., Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 512, 525, 409 A.2d 446, 452 (1979).

In the instant case there are no constitutional contentions or evidential issues raised. Applying the above standard of review, the sole question for us is whether the PUC committed an error of law. For the reasons set forth in this opinion we conclude that there was no such error; and we affirm the PUC's order in this case.

ORDER

AND Now, the 18th day of December, 1980, the corrected order of the Pennsylvania Public Utility Commission entered in the above matter, No. C-78050353, is affirmed.