

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-12-1998

# City of Pittsburgh v. West Penn Power Co

Precedential or Non-Precedential:

Docket 98-3014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"City of Pittsburgh v. West Penn Power Co" (1998). *1998 Decisions*. Paper 141.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/141

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 12, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3014

CITY OF PITTSBURGH,
        Appellant

v.

WEST PENN POWER COMP.,
d/b/a ALLEGHENY POWER;
ALLEGHENY POWER SYSTEM, INCORPORATED;
DUQUESNE LIGHT COMPANY; DQE, INC.

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 97-1772)

Argued March 20, 1998

BEFORE: BECKER, Chief Judge, RENDELL, and
HEANEY,* Circuit Judges

(Filed: June 12, 1998)

_____

*The Honorable Gerald W. Heaney, Senior United States Circuit Judge
for the Eighth Circuit sitting by designation.

WENDELYNNE J. NEWTON,
 ESQUIRE
THOMAS L. VAN KIRK, ESQUIRE
 (ARGUED)
SHEILA S. DINARDO, ESQUIRE
DAVID J. PORTER, ESQUIRE
Buchanan Ingersoll Professional
 Corporation
One Oxford Centre
301 Grant Street
20th Floor
Pittsburgh, PA 15219-1410

Counsel for the City of Pittsburgh

DAVID L. MCCLENAHAN, ESQUIRE
JAMES E. SCHEUERMANN,
 ESQUIRE (ARGUED)
WENDY E. D. SMITH, ESQUIRE
Kirkpatrick & Lockhart, LLP
1500 Oliver Building
Pittsburgh, PA 15222

WILLIAM J. MURPHY, ESQUIRE
Murphy & Schaffer
100 Light Street
9th Floor
Baltimore, MD 21202-1019

Counsel for West Penn Power
Company d/b/a Allegheny Power
and Allegheny Power Systems

THOMAS L. ALLEN, ESQUIRE
 (ARGUED)
DONNA MAUS, ESQUIRE
Reed Smith Shaw & McClay, LLP
P.O. Box 2009
435 Sixth Avenue
Pittsburgh, PA 15230-2009

Counsel for Duquesne Light Company
and DQE, Inc.

2

OPINION OF THE COURT

RENDELL, Circuit Judge.

Appellant, the City of Pittsburgh, filed this antitrust action against West Penn Power Company, d/b/a Allegheny Power, and Duquesne Light Company alleging that the two companies entered into a pre-merger agreement in restraint of trade and that their proposed merger would substantially lessen competition or tend to create a monopoly. The City claims that an agreement between Allegheny Power and Duquesne Light to withdraw Allegheny Power's application before the Public Utility Commission to provide electric service to two Redevelopment Zones within the City violated Section 1 of the Sherman Act.1 The City also seeks injunctive relief against the proposed merger between the two utilities arguing that it violates Section 7 of the Clayton Act.2

The district court granted the utility companies' motions to dismiss, finding that given the allegations of the complaint, the City lacked standing because it had not experienced an antitrust injury. Because we agree that the City has failed to allege that it meets the prudential requirements of antitrust standing, we will affirm the decision of the district court.

_____

1. Section 1 of the Sherman Act provides, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. S 1.

2. Section 7 of the Clayton Act, 15 U.S.C. S 18, states the following:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

3

I.

FACTUAL BACKGROUND AND ALLEGATIONS

As an initial matter, we must determine the extent of our consideration of the materials submitted by the parties. When deciding a motion to dismiss, it is the usual practice for a court to consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record. See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 1357 (2d ed. 1990). However, the parties here have provided the court with numerous documents pertaining to the regulatory proceedings that are at the heart of the instant controversy. We note -- as did the district court -- that it can be, and is in this instance, proper to consider these documents in reviewing a motion to dismiss. See Pension Benefits Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993) (finding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff 's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied."). Our recounting of the averments of the complaint, therefore, is informed by the context provided by these documents and other public records of which we can take judicial notice.[3] Our factual recitation will also include a short discussion of the nature of the utility industry in Pennsylvania which provides the regulatory context of this case.

The City of Pittsburgh, located in Allegheny County, is currently embarking on a plan to revitalize several urban areas, called the Redevelopment Zones, which were formerly industrial sites.[4] According to the City's plans, these currently vacant sites will eventually be home to industrial, commercial and residential activity. Compl. PP 12, 13. The City believes that competition for retail

_____

3. Neither party contests the authenticity of these documents and all were submitted by the parties as the joint appendix in this case.

4. The two areas to be redeveloped are the 123 acre "South Side Works" and the 233 acre "Nine Mile Run." Compl. P 12.

electric service would facilitate economic development in these areas. Id. P 14. This desire for competition comes at a time when the regulatory landscape for utilities in Pennsylvania is undergoing significant change.

In Pennsylvania, the regulation of electric service distribution has traditionally afforded utility companies natural monopolies. See Barasch v. Pennsylvania Pub. Util. Comm'n, 546 A.2d 1296, 1298 (Pa. Commw. Ct. 1988). The industry operates in a comprehesive regulatory structure supervised by the Pennsylvania Public Utility Commission ("PUC"), which is an independent administrative agency authorized by the state to regulate public utility companies doing business in Pennsylvania. 66 Pa. C.S.A. SS 301, 501. The Pennsylvania Public Utility Code gives the PUC broad power to "supervise and regulate" public utilities. Id. S 501(b). The PUC is mandated to act in the public interest in overseeing public utilities. A utility company must obtain a certificate of public convenience from the PUC in order to provide retail electric service to a particular area. Id. S 1101.5 Each certificate describes the geographic territory in which the holder is permitted to supply electric service. Id. A certificate may be amended only with permission from the PUC, pursuant to 66 Pa.C.S.A. S 1102. Historically, a utility is able to enter another's service area only if it demonstrates that the area's certificated utility is providing inadequate service to customers in the proposed new territory. See Lansberry, Inc. v. Pennsylvania Pub. Util. Comm'n, 444 A.2d 832, 834-35 (Pa. Commw. Ct. 1982) (discussing requirement of demonstrating inadequacy of service in context of PUC certificate to transport). In addition, generally, the retail rates that a utility charges must be approved by the PUC. 66 Pa. C.S.A. S 1303. For example, the rates of both Allegheny Power and Duquesne Light are now, and have always been, subject to regulatory

_____

5. A certificate of public convenience "makes it lawful for [a] public utility
to provide service within a defined territory, and imposes on the public utility an obligation to provide service in that territory." Lukens Steel Co.
v. Pennsylvania Pub. Util. Comm'n, 499 A.2d 1134, 1136 n.1 (Pa. Commw. Ct. 1985).

approval by the PUC. Further, the PUC reviews all proposed utility mergers. Id. SS 1102, 2811.6

Recently, the Pennsylvania legislature passed the Electricity Generation Customer Choice and Competition Act. Id. S 2801 et seq. The Competition Act sets forth a plan that will gradually introduce competition within the retail generation function of the electric utility industry.7 This legislation envisions a transition from an industry which is largely regulated to one where there is a competitive market. This statute recognizes continued PUC oversight of electricity generation during the "transition" period from January 1, 1997 to January 1, 2001. Id. SS 2804, 2806. While the Competition Act will introduce some competition among electric service providers in Pennsylvania, it does not entirely displace the regulatory function of the PUC. Because the Competition Act did not alter the statutory requirement that Allegheny Power petition the PUC to amend its certificate, that Act's passage does not alter our analysis of this case. At all times relevant to the events recounted in the City's complaint, Allegheny Power and Duquesne Light were operating under the regulated industry conditions.8

In the summer of 1996, Allegheny Power and Duquesne Light were the only electric utilities possessing certificates of public convenience from the PUC to provide electric service in Allegheny County. Compl. P 17. It is uncontested that Allegheny Power's certificate does not permit it to

_____

6. During the pendency of this litigation, the Allegheny Power and Duquesne Light merger was conditionally approved by the PUC. See 66 U.S.L.W. 2689, 2696-97 (U.S. May 19, 1998) (discussing PUC decision In Re Joint Application of DQE Inc., Pa. P.U.C., No. A-110150F.0015, 4/30/98).

7. In its plans for the restructuring of the electric utility industry in Pennsylvania, the legislature distinguishes between the functions of generation, transmission, and distribution of electricity. Under the new statutory provisions, the transmission and distribution of electricity will continue to be treated as a natural monopoly and will still be subject to the supervision of the PUC. 66 Pa. C.S.A. S 2801 et seq.

8. While the statute authorizes the initiation of "pilot programs" in 1997, the parties in the present case have not contended that they were participants in this program. 66 Pa. C.S.A. S 2806 et seq.

6

provide electric service to the area of the City in which the Redevelopment Zones are located. JA at 197 (P 11). Duquesne Light is the only utility with a certificate to provide electric service to this area of the City. JA at 195 (P 1). Duquesne Light claims that its certificate grants it the exclusive right to provide power to the Redevelopment Zones. Compl. P 28. Because of its belief that competition for retail electric power was "essential" to the success of this redevelopment effort, and because Allegheny Power's tariff rates are substantially lower than those of Duquesne Light, the City entered into discussions with Allegheny Power regarding the possibility of having Allegheny Power submit a proposal to provide electric service to the Redevelopment Zones. Id. PP 18, 20, 26. In furtherance of its goal of obtaining competitive utilities for the area, the City filed a "Petition in Support of Choice for Retail Electric Service Within Certain Redevelopment Zones Within the City of Pittsburgh" with the PUC in September of 1996. Id. P 22. Allegheny Power intervened in support of this petition and also filed a separate application with the PUC for permission to supply electrical service to the Redevelopment Zones. Id. PP 24, 30. Duquesne Light opposed both of these petitions. Id. PP 27, 32.

In their petitions before the PUC both the City and Allegheny Power contested Duquesne Light's assertion of exclusive rights. A review of the applications made to the PUC is useful to clarify exactly what the City and Allegheny Power were seeking with respect to Allegheny Power's ability to offer electric service in the Redevelopment Zones. In its filing, the City requested that the PUC "take actions necessary to allow choice and competition for retail electric service in two discrete areas in the City undergoing redevelopment . . . wherein Duquesne Light Company .. . and [Allegheny Power Company] . . . would compete for new customers and new electric load." JA at 194 (emphasis added). Further, the City stated in this petition that "[t]o the best of the City's knowledge, Duquesne is at the present the only electric utility possessing a certificate of public convenience ("certificate") from the Commission to serve the City and its citizens." JA at 195 (P 1). In its reply to Duquesne Light's Answer to the City's Petition, the City states that it is requesting that the "two utilities, Duquesne

7

and [Allegheny Power], upon the latter's application and grant therefor, hold overlapping certificates to provide retail electric service in the two discrete Redevelopment Zones . . ." JA at 223 (P 24).

In its filing to intervene in support of the City's petition, Allegheny Power asserted that it would "apply for authority to provide retail electric service in the Redevelopment Areas and that subject to approval of the Commission, [Allegheny Power] will provide retail electric service to the Redevelopment Areas pursuant to [Allegheny Power's] tariff rates and terms." JA at 200 (P 3). In its own application to the PUC, Allegheny Power requested approval for the utility "to begin to offer, render, furnish or supply electric service in two specific additional territories within the boundaries of the City of Pittsburgh." JA at 235 (emphasis added). These documents make clear that both the City and Allegheny Power were applying to the PUC so that Allegheny Power would be given the regulatory permission to begin to supply electric power in the area of the Redevelopment Zones.

In November of 1996, the Urban Redevelopment Authority of Pittsburgh[9] issued a Request for Proposals ("RFP") soliciting bids for the provision of the "electric utility infrastructure development" of the Redevelopment Zones. Compl. P 33. Both Allegheny Power and Duquesne Light responded to the RFP with significantly different bids, Allegheny Power's being the lower of the two. Id. P 35. On February 25, 1997, an Administrative Law Judge ("ALJ") held a prehearing conference on Allegheny Power's PUC application. At this hearing the ALJ set a schedule for the submission of testimony regarding Allegheny Power's application and scheduled further hearings for the week of June 9, 1997. Id. P 39. In March of 1997, the PUC consolidated the proceedings involving the City's petition with those of Allegheny Power's application. Id. P 40.

_____

9. According to the City, the Redevelopment Authority "works closely with the City to implement redevelopment plans that support and are consistent with the City's economic development objectives." Compl. P 33.

8

On April 7, 1997, Duquesne Light and Allegheny Power announced their intention to merge. Id. P 42. The City alleges that under the terms of the premerger agreement, the two utilities agreed that they would not file any applications with the government without prior consultation and would not make any changes with respect to rates without first consulting each other. Id. P 45. The City avers that these agreements constitute impermissible premerger coordination. Id. P 46. Later in April, Duquesne Light requested a stay of the PUC proceedings before the ALJ, which was denied. Id. P 48, 50. On June 6, 1997, Allegheny Power filed a petition to withdraw its PUC application and to withdraw as an intervenor in the City's pending PUC petition. Id. P 52. The ALJ granted these petitions. Id. P 54. After filing this complaint in federal court, the City petitioned the PUC for a stay of the regulatory proceedings. JA at 445. When this petition was denied, the City withdrew its petition seeking choice for retail electric service. JA at 523-28. Because the City's petition and Allegheny Power's application were withdrawn, the PUC never made a determination as to whether Duquesne Light's certificate gave it exclusive rights to serve the Redevelopment Zones or whether the Commission could or would amend Allegheny Power's certificate in order to permit it to provide electric service in these areas.

In its complaint, the City contends that the actions of Allegheny Power and Duquesne Light violated 15 U.S.C. S 1 ("the Sherman Act") and 15 U.S.C. S 18 ("the Clayton Act"). The City asserts that it has suffered the following damage as a result of the alleged Sherman Act violations: "expending significant efforts to bring competition to the Redevelopment Zones; paying higher, non-competitive rates for electric utility service generally; and losing the opportunity to have lower electric service charges .. . ." Compl. P 59. The City seeks treble damages for the alleged Sherman Act violation.10 The City further argues that a

_____

10. Section 4 of the Clayton Act, which provides for treble damages based on antitrust violations, states as follows:

> [A]ny person who shall be injured in his business or property by
> reason of anything forbidden in the antitrust laws may sue therefor

9

merger between the two utility companies violates the Clayton Act in that it would have anticompetitive effects, and thus seeks injunctive relief to prevent the proposed merger.11 Id. P 66. The City also raises the related state law claims of restraint of trade, civil conspiracy, breach of contract, tortious interference, breach of good faith and fair dealing, and detrimental reliance.

Allegheny Power and Duquesne Light each moved to dismiss the City's complaint pursuant to Fed. R. Civ. P. 12(b)(6). This motion was referred to a Magistrate Judge who issued a report recommending that the motions be granted. On January 6, 1998, the district court adopted this report thereby granting defendants' motions to dismiss and declining to exercise jurisdiction over the City's state law claims. The City filed this timely appeal. Our jurisdiction is founded on 28 U.S.C. S 1291.12

_____

        in any district court of the United States in the district in which the
        defendant resides or is found or has an agent, without respect to the
        amount in controversy, and shall recover threefold the damages by
        him sustained, and the cost of suit, including a reasonable
        attorney's fee.

15 U.S.C. S 15.

11. Section 16, which provides for injunctive relief, states, in pertinent part:

        Any person, firm, corporation, or association shall be entitled to sue
        for and have injunctive relief, in any court of the United States
        having jurisdiction over the parties, against threatened loss or
        damage by a violation of the antitrust laws . . . when and under the
        same conditions and principles as injunctive relief against
        threatened conduct that will cause loss or damage is granted by
        courts of equity . . . .

15 U.S.C. S 26.

12. We exercise plenary review over the district court's grant of defendants' motions to dismiss. Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 277 (3d Cir. 1996). In so doing, we accept as true all factual allegations in the complaint and will not affirm the motion to dismiss "unless it is certain that no relief can be granted under any set of facts which could be proved." Fuentes v. South Hills Cardiology, 946 F.2d 196, 201 (3d Cir. 1991) (citation omitted).

II.

THE DISTRICT COURT'S RULING

The district court granted the defendants' motions to dismiss because the City lacked standing to bring an antitrust claim. It reasoned that there had been no antitrust injury to the City for two reasons:

First, since Allegheny Power and Duquesne Light had not engaged in competition in light of their regulated provision of services, the agreement between Duquesne Light and Allegheny Power to withdraw Allegheny Power's bid, as well as the proposed merger, did not lessen competition. City of Pittsburgh v. West Penn Power Co., ___ F. Supp. ___, 1998 WL 64074, at * 4 (W.D. Pa. Jan. 6, 1998). As to the City's claim that the proposed merger would eliminate prospective competition, the court found this claim to be too speculative to be actionable. Id.

Second, the court found that the City was denied an opportunity that was contingent on the decision of the PUC and thus, the fact that no competition existed was the result of the regulatory structure. Id. at *5. The district court found that as the City's alleged damages were not the result of harm to competition, they did not constitute the type of injury the antitrust laws were intended to prevent. Id. at *4-5. The district court therefore concluded that, because any injury that was experienced or threatened was not an antitrust injury, the City lacked standing to pursue its claims under the Sherman and Clayton Acts. Id. at *5.

III.

ISSUES ON APPEAL

The City contests the district court's conclusion, arguing that the allegations of the complaint regarding the loss of competition are sufficient to allege the type of injury the antitrust laws are designed to prevent. It contends that the district court's ruling that the City did not have standing due to lack of antitrust injury fails to properly consider not only its allegations but also the applicable law regarding

11

antitrust injury. We review plaintiff 's complaint not to determine whether the City has averred harm to competition -- which it has -- but, rather, to determine whether the injury the City alleges can legally form the basis for relief under the antitrust laws.

The City contends that the district court ignored the allegations of the elimination of competition, arguing that the court should have taken the allegations of its complaint at face value. Yet our courts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner.13 In scrutinizing plaintiff's claim in this way at the outset, we are mindful of the balance that must be struck in assessing antitrust claims. As the Supreme Court stated, referring to standing in the context of S 4 of the Clayton Act:

> [N]either the statutory language nor the legislative history of S 4 offers any focused guidance on the question of which injuries are too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit under S 4; indeed, the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin S 4 in ways that will defeat its broad remedial objective. But the potency of the remedy implies the need for some care in its application.

Blue Shield of Virginia v. McCready, 457 U.S. 465, 477 (1982).

Regulatory Framework

The present case arises in a factual context which is

_____

13. For example, we need not accept as true "unsupported conclusions and unwarranted inferences." Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir.), cert. denied, 118 S. Ct. 435 (1997). Nor can we "assume that the [plaintiff] can prove facts that it has not alleged . . . ." Associated Gen. Contractors
of California v. California State Council of Carpenters, 459 U.S. 519, 526 (1983).

substantially different from that of most antitrust cases. The plaintiff has alleged anticompetitive behavior in an industry which is highly regulated: those who wish to compete to provide their services must obtain a certificate from the PUC to do so. As the First Circuit has explained, "[f]ull price regulation dramatically alters the calculus of antitrust harms and benefits." Town of Concord, Mass. v. Boston Edison Co., 915 F.2d 17, 25 (1st Cir. 1990) (holding that alleged price squeeze did not violate Sherman Act because utility's rates were regulated). Similarly, here, the regulation which frames the issue is the statutory requirement that a utility obtain permission from the PUC, in the form of a certificate, in order to provide electric service to a particular geographic region.

The Supreme Court has made clear that regulated industries -- even those that historically have been treated as natural monopolies -- are not exempt from the antitrust laws. See Otter Tail Power Co. v. United States , 410 U.S. 366 (1973). However, in this case, the comprehensive regulatory framework significantly restricts the nature of the competition which is permitted. While it is true that the regulatory landscape of the electric power industry is in the process of changing, even the Competition Act does not anticipate a completely "free market" for electric services. Rather, the changes will result in a form of regulated competition. Further, in the words of the Schuylkill Energy court, "We will not attempt to predict the future of competitive retail access in Pennsylvania." Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 416 (3d Cir.), cert. denied, 118 S. Ct. 435 (1997). We cannot know whether these two utilities will ever be permitted to compete for retail customers in a particular geographic region.

Antitrust Standing

The question of standing is a threshold inquiry in all actions. However, the constitutional and prudential requirements of standing take on particular significance in the context of the antitrust laws, where a balance must be struck between encouraging private actions and deterring legitimate competitive activity through overly vigorous enforcement. See, e.g., Capital Imaging Assoc. v. Mohawk

13

Valley Med. Assoc., 996 F.2d 537, 539 (2d Cir. 1993) (cautioning that were the "heavy power [of antitrust law] brought into play too readily it would not safeguard competition, but destroy it"). Thus, in undertaking this standing analysis, we must remain mindful of the purposes and goals of the antitrust laws at issue -- to preserve and promote competition.

The constitutional standing inquiry -- namely, whether there is a "case" or "controversy" within the meaning of Article III, S 2 of the Constitution -- is augmented by consideration of prudential limitations. Without these prudential considerations, "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent . . . and judicial intervention may be unnecessary to protect individual rights." Warth v. Seldin, 422 U.S. 490, 500 (1975).

Thus, the crux of the issue in this case is whether the City satisfies the "prudential" requirements of standing; that is, does the City have "antitrust standing," and is the plaintiff a proper party to bring a private antitrust action? In Associated General, the Supreme Court outlined the factors that courts should consider when determining whether a party has standing to bring a private action under the antitrust laws. Associated Gen. Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 537-45 (1983). Its approach to the standing inquiry has been interpreted as requiring a narrowing view, as opposed to the broad remedial purpose approach of cases that preceded it. See Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997). The Associated General test has been regularly and consistently applied as the passageway through which antitrust plaintiffs must advance, and we have recently restated the factors we are to examine:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws

14

were intended to provide redress;14 (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Barton & Pittinos, 118 F.3d at 181 (citing In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165–66 (3d Cir. 1993)). The antitrust standing inquiry is essentially the same under both S 4 and S 7 of the Clayton Act, except that when seeking injunctive relief, "the complainant need only demonstrate a significant threat of injury from an impending violation of the antitrust laws." Mid–West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 591 (3d Cir. 1979) (quotation omitted); see also Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 111–112 (1986). Furthermore, this court has emphasized that the antitrust standing inquiry is not a black–letter rule, but rather, is "essentially a balancing test comprised of many constant and variable factors . . . ." Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964–65 (3d Cir. 1983) (citing Bravman v. Bassett Furniture Indus., 552 F.2d 90, 99 (3d Cir. 1977)).

We conclude that, balancing all of the relevant facts in the instant case, the City's claims fail to meet the standing requirements we have set forth, due to the lack of causal connection between the defendants' actions and the alleged harm and because of the absence of antitrust injury. We will combine our discussion of causation and injury as the two issues are inextricable in this case. Further, we find that because there is no causal connection and no antitrust injury, we need not examine the other Associated General standing factors.

_____

14. This element of the standing test is the "antitrust injury" requirement.

15

IV.

CAUSAL CONNECTION AND ANTITRUST INJURY

In evaluating the factors necessary for standing, we have stated that a showing of "[a]ntitrust injury is a necessary but insufficient condition of antitrust standing." Barton & Pittinos, 118 F.3d at 182. By this we mean that the district court should first address the issue of whether the plaintiff suffered an antitrust injury. If antitrust injury is not found, further inquiry is unnecessary.

In explaining its reasoning, the district court cited the following passage from Brunswick, which defines "antitrust injury":

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetive acts made possible by the violation.

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

From the Court's description of antitrust injury, we learn that the question of whether the plaintiff has experienced antitrust injury depends in part on its source -- did the injury flow from that which makes the defined acts unlawful. To answer this question, we must examine the causal connection between the purportedly unlawful conduct and the injury.15 In this case, we find that

_____

15. As many commentators and courts have noted, the questions of antitrust injury and antitrust standing are difficult to disentangle. We believe that, similarly, in the present case, there is no bright line distinction between the two concepts. See, e.g., Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 394-95 (7th Cir. 1993); Triple M Roofing Corp. v. Tremco, Inc., 753 F.2d 242, 247 (2d Cir. 1985); see also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law P 360(e), at 200 (1995); William Page, The Scope of Liability for Antitrust Violations, 37 Stan. L. Rev. 1445, 1484-85 (1985); Nat Stern & Kevin Getzendanner, Comment, Gauging the Impact of Associated General Contractors on Antitrust Standing Under Section 4 of the Clayton Act, 20 U.C. Davis L. Rev. 159, 175-179 (1986); Daniel Richman, Note, Antitrust Standing, Antitrust Injury, and the Per Se Standard, 93 Yale L.J. 1309 (1984).

determining whether antitrust injury is present necessarily involves examining whether there is a causal connection between the violation alleged and the injury.

Accordingly, rather than trying to separate these two factors of causation and injury, we will treat them together. The facts which form the basis for the district court's conclusion, and ours as well, are central to both tests. These facts include the following: Allegheny Power and Duquesne Light were never competitors; the regulatory scheme mandated that they not compete; attempts by the City and Allegheny Power to bring about competition were no more than attempts, with no assurance that competition would be permitted; and any injury suffered by the City did not flow from the defendants' conduct, but, rather, from the realities of the regulated environment in which all three were actors. Here, both the lack of any antitrust injury -- in the sense of its total absence as defined by the district court -- and the attenuated nature of the causation, defeat the City's standing.

We should note at the outset that we disagree with the City's argument that Brunswick and the other cases discussing antitrust injury cited by the district court are inapposite because they involved suits by competitors, not by consumers.16 The City urges that as long as the City is a consumer -- as it contends it is -- harm to it constitutes antitrust injury.17 However, we do not find the City's status as a consumer to be dispositive. We read the cited passage

_____

16. In Brunswick, several smaller operators of bowling alleys sued a larger operator who was also a bowling equipment manufacturer. According to the plaintiffs, Brunswick's activity of acquiring failing alleys
and providing cash to keep them afloat violated Section 7 of the Clayton Act. They argued this continued competition reduced their profits. Using the test set forth above, the Supreme Court held these lost profits did not constitute "antitrust injury." Brunswick, 429 U.S. at 489.

17. In its complaint, the City alleged that it was bringing this action "on
its own behalf as a purchaser of electric utility service" and "on behalf of its citizens and to protect the economy of Pittsburgh." Compl. P 4. Defendants contest the City's ability to bring this action on behalf of its
citizens. It is, however, uncontested that the City will be a purchaser of electricity -- for streets, public works, and other infrastructure -- in the
Redevelopment Zones though it is not now a purchaser in these areas.

from Brunswick, and the opinion itself, to have broader application. Brunswick tells us to intensify our focus and consider not only the fact that there may be an agreement which is harming others in the marketplace, but to also ask first whether the alleged injury is really of the type that the antitrust laws were intended to prevent, and, as part of that assessment, whether the injury flows from that which makes defendants' acts unlawful.

The key sentence in Brunswick, cited above, is the last: "The injury should reflect the . . . anticompetitive acts made possible by the violation." 429 U.S. at 489. It directs us to look back from the vantagepoint of the injury to test the nature of the cause, rather than to presume antitrust injury wherever there is an agreement or merger that results in harm. This inquiry led to a conclusion of that the plaintiff lacked standing in Brunswick. Although the analysis is slightly different, the same result follows on the facts of this case. The purported lessening of competition was not caused by the premerger agreement and proposed merger between Allegheny Power and Duquesne Light. The City's inability to choose to buy from either Allegheny Power or Duquesne Light for the Redevelopment Zones is an injury visited upon it by the regulated nature of utility services, not caused by an agreement between Duquesne Light and Allegheny Power to withdraw Allegheny Power's application to be able to compete.

The City's position that it has suffered an antitrust injury is an attempt to equate the submission of bids andfiling of petitions with actual competition. The City's complaint states that the City engaged in "negotiations with Allegheny Power for the provision of electric utility service to the Redevelopment Zones, subject to Allegheny Power obtaining a certificate from the PUC." Compl. P 41. The City acknowledges that competition was not possible without PUC approval when it requested that the PUC "take actions necessary to allow choice and competition for retail electric service" in the Redevelopment Zones. JA at 194. Thus, we need not resolve the issue of whether Duquesne Light's certificate to provide electricity to the Redevelopment Zones was exclusive. Rather, it is sufficient that we can determine from the face of the complaint that Allegheny Power never

18

had the certificate from the PUC necessary to permit it to provide power in the Redevelopment Zones. It never did compete, and, therefore, any injury to the City did not result from a lessening of competition. In fact, as the district court correctly points out, the actions of the utilities merely maintained the status quo. Thus, the utilities' purported antitrust violation can only be said to have been competition-neutral and as such, is not actionable. See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990) (stating that "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior").

The district court concluded that because neither the agreement nor the proposed merger had brought about the lessening of competition in a "marketplace" where there was no competition, there was no antitrust injury. Wefind this conclusion of the district court to be well founded, notwithstanding the City's bold averments as to loss of competition. Without demonstrating that there was competition, a plaintiff cannot show that the defendants' actions have had or will have anticompetitive effects. See, e.g., Continental Cablevision of Ohio, Inc. v. American Elec. Power Co., 715 F.2d 1115, 1119-20 (6th Cir. 1983) (finding that without competition, there can be no injury to competition).

It is telling that nowhere in the complaint does the City directly aver that there had ever been competition between Duquesne Light and Allegheny Power.18 The City argues that it is the competitive process that antitrust laws are designed to protect -- and that the submission of bids in response to the RFP constitutes a "competitive process." However, this argument does little to further the City's position because, in the present case, the competitive process does not even exist because of regulatory restraints.

_____

18. Paragraphs 9 & 10 of the City's complaint contain nearly identical statements regarding the business of each utility, but contains no averment that the two companies compete. Elsewhere in the complaint, harm to competition is averred in broad, conclusory terms. See Compl. P 66.

19

The City's first claim is brought under the Sherman Act, which prohibits contracts, combinations or conspiracies "in restraint of trade." 15 U.S.C. S 1. However, under the Sherman Act agreements can only restrain that which has occurred, is occurring, or is reasonably likely to occur. Since the realization of competition is in the hands of regulators there is no way that the City can show that competition would have occurred absent the concerted activity between the two utilities.

The City's Clayton Act claim fails under a similar analysis. Section 7 of the Clayton Act prohibits all mergers "where in any line of commerce, or in any activity affecting commerce in any section of the country, the effect may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. S 18. The complaint avers that the relevant "line of commerce" for the Clayton Act claim is the "provision of retail electric utility service in the Redevelopment Zones." Compl. P 62. The City argues that the proposed merger will lessen competition by "eliminating actual and prospective competition between Allegheny Power and Duquesne Light in the relevant line of commerce . . ." Id. P 66(a). The only "actual competition" that the City alleges in its complaint is the competition to be able to provide electric power to the Redevelopment Zones, which does not constitute actual competition.

Section 16 of the Clayton Act does permit injunctive relief "against threatened loss or damage." 15 U.S.C.S 26; see Mid-West Paper Products Co., 596 F.2d at 590-91. 19 The City argues that the fact that the proposed merger will lessen "prospective competition" should be sufficient to state a claim. However, we agree with the reasoning of the district court that the threatened loss "is contingent on the PUC permitting competition within the City in thefirst instance." Thus, with respect to the "prospective injury"

_____

19. The City has not explicitly argued this case under a "potential competition" theory and therefore we will not address that issue here. We do note, however, that the cases articulating this theory would be of doubtful support to the City. See, e.g. , United States v. El Paso Natural Gas Co., 376 U.S. 651 (1964); United States v. Falstaff Brewing Corp., 410 U.S. 526 (1973).

argument, the issue turns not on whether Allegheny Power and Duquesne Light did compete -- but whether they were going to compete for the ability to provide power in the Redevelopment Zones. Allegheny Power was not legally able to provide power in the Redevelopment Zones and we do not know whether the PUC would ever have granted the permission for it to do so. Thus, as a matter of law, the court cannot conclude that the loss of potential competition was causally related to the decision of the two power companies to merge. The City is really claiming that it would have benefited from competition it hoped would occur. However, the appellants cannot foist their version of what might have been on the court under the rubric of antitrust injury. The presence of the regulatory scheme and need for approval in connection with the choice of utilities to serve the Redevelopment Zones cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise.

There are no facts averred in the complaint which even permit us to speculate as to the likelihood of the PUC granting certification to Allegheny Power. Further, the City does not allege, and there is nothing in the record to indicate, that any parties considered these applications to be mere administrative formalities. To the contrary, the PUC applications filed by the City and Allegheny Power -- and the responses to them by Duquesne Light -- make clear that PUC proceedings to amend Allegheny Power's certificate were already being vigorously contested. See, e.g., JA at 267-287. Thus, we simply cannot know whether there is any causal connection between the harm which has arguably been suffered by the City and the alleged Sherman Act violation.

As the Supreme Court stated in Brunswick, antitrust injury must be caused by the antitrust violation-- not a mere causal link, but a direct effect. 429 U.S. at 489. Here, the interposition of the regulatory scheme and actions of the parties -- both defendants and plaintiff -- interferes with the chain of causation. The statutory scheme precluded competition without the requisite regulatory permission. As Professors Areeda & Hovenkamp describe, "a plaintiff cannot be injured in fact by private conduct

21

excluding him from the market when a statute prevents him from entering that market in any event." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law P 363(b), at 222 (1995) (citing Axis S.p.A. v. Micafil, Inc., 870 F.2d 1105 (6th Cir. 1989)).

As Areeda & Hovenkamp explain, the Section 4 plaintiff "must establish that he actually `sustained' injury-in-fact to `business or property,' and the `by reason of ' language [of S 4] insists that such injury be caused by the violation." Id. P 360, at 192. The requirements for injunctive relief are similar except that the statutory language of Section 16 permits relief upon a showing of "threatened loss." However, the plaintiff must still demonstrate that this "threatened injury would be caused by the alleged antitrust violation . . . ." Id. P 360(b), at 193 (emphasis added). Thus, the City will never be able to prove a direct link between the alleged antitrust violation and their purported injury. The absence of antitrust injury and causal connection clearly defeat the City's standing.

The lack of causal connection between the violation alleged and the City's injuries is further demonstrated when we examine the damages alleged by the City. The injury is not only "speculative" because it is difficult to measure; rather, it is speculative because the injury claimed may never occur. An examination of the following damages listed in the City's complaint reveals no direct link between the purported antitrust violations and the harm alleged to have been suffered by the City: "expending significant efforts to bring competition to the Redevelopment Zones; paying higher, non-competitive rates for electric utility service generally; and losing the opportunity to have lower electric service charges in the Redevelopment Zones necessary to attract the maximum intended economic development to the Zones and foster full economic growth." Compl. P 59. The City has failed to offer any support for the proposition that the first alleged harm -- the fact that the City spent money to bring competition to the Redevelopment Zones -- is a cognizable antitrust injury.[20] The other damages are

_____

20. The proper measure of damages for a price-fixing violation under the Sherman Act is the difference between the prices actually paid and those

22

precisely the type which cannot be directly connected to the alleged agreement. There is no way to determine whether the rates the City will pay for electric service are or will be affected by the alleged actions of Allegheny Power and Duquesne Light. A consumer alleging antitrust violations "cannot obtain damages without showing that he actually paid more than he would have paid in the absence of the violation." Areeda & Hovenkamp, supra, P 370, at 253.

In its complaint, the City alleges a violation of Section 1 of the Sherman Act and requests that "defendants be ordered to pay the City damages sustained by it and the citizens it represents, trebled . . ." Compl. P 93. However, there is no way for the court to determine what "damages" were sustained. We cannot assume the existence of a PUC certificate for the purposes of assessing damages. Thus, the damages alleged by the City are not simply difficult to measure, but their occurrence would, in fact, be impossible to prove. The injury averred by the City is simply too speculative to permit relief under the antitrust laws.

With respect to injunctive relief, the City cannot show a significant threat of injury from an impending antitrust violation. The City cannot prove that harm is threatened because it cannot demonstrate that it has lost anything -- namely, competition among electric utilities -- that would have existed but for the actions of the defendants. Further, now that all parties, including the City, have withdrawn

_____

that would have been paid absent the conspiracy. See, e.g., State of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1077 (2d Cir. 1988); see also Robert Blair & William Page, "Speculative" Antitrust Damages, 70 Wash. L. Rev. 423, 426 (1995) (Plaintiff must project a "hypothetical or `but-for' condition that excludes only the effects of the defendant's illegal conduct." Damages are measured by "[t]he difference between that projected condition and the plaintiff's actual condition."). The injury alleged by the City here is purportedly separate from the injury of having to pay higher prices for electric service. In fact, the language of this claim merely underscores the fact that no competition existed between the two utilities. When a market participant expends resources to encourage competition, the participant risks that such expenditure will not result in lower prices. Despite this risk, the City chose to pursue its "efforts" with Allegheny Power.

23

from the regulatory proceedings, an injunction would not alter the City's current situation. That is, the question of whether the PUC would amend Allegheny Power's certificate and permit it to provide electric service to the Redevelopment Zones would remain unresolved.

We affirm the district court's conclusion that because there had previously been no competition in the market for electricity, "neither the proposed merger nor the withdrawal of Allegheny Power's application has lessened the competition within the City or the choices of utility companies available to the City." City of Pittsburgh, 1998 WL 64074, at * 4. Thus, as the district court notes, it is the structure of the regulated industry, not the defendants' conduct, which creates the lack of competition -- and under these facts -- the lack of antitrust standing. That does not mean that utilities are immune from antitrust liability.[21] However, in the present case, the remedy that appellant seeks would require this court to assume the existence of a competitive situation. This we cannot do.

The City argues that if the antitrust laws are not diligently enforced during the transition to deregulation under the Competition Act, there is a risk that regulated electric utility monopolies will simply be replaced by unregulated ones who would also enjoy immunity from the antitrust laws. We make clear that this ruling is fact-specific to the current climate in which the instant facts developed, namely, in the era of "regulated electric utility monopolies" as the City terms it. The very essence of our ruling is that the advent of deregulation will likely remove the break in the causal chain so that future utility arrangements in the free market atmosphere may well pass muster for purposes of standing under the antitrust laws. Had the ability of the utilities to serve various customers in various regions not been subject to approval of the PUC, our standing analysis would be radically different.

_____

21. Further, this decision does not affect the City's ability to proceed in
state court on its state law claims for restraint of trade, civil conspiracy,
breach of contract, tortious interference, breach of good faith and fair dealing, and detrimental reliance.

24

In conclusion, because we believe that the City cannot establish the necessary antitrust injury and causal connection between the alleged antitrust violation and its injury, we will affirm the district court's grant of defendants' motions to dismiss.

HEANEY, Senior Circuit Judge, dissenting.

I cannot agree with the majority that there is no antitrust injury or no causal connection between the City's injury and the defendants' conduct. The defendants conspired to deprive the City of the opportunity to obtain less expensive electricity to assist in bringing new jobs to the City. In my view, the majority opinion opens the door for similar anti-competitive practices to go unpunished.

I accept the statement of facts set forth by the majority, but supplement it in order to underscore the bad faith exhibited by Allegheny Power and Duquesne Light Company.[1] Attempting to create new jobs in the Redevelopment Zones, the City recognized that high-cost electricity was a detriment to attracting new businesses. Estimating that the Redevelopment Zones would support up to 7,300 new jobs and approximately 1,400 new residences, the City began negotiating with Allegheny Power to provide less expensive electricity.

The City and Allegheny Power negotiated for several months and Allegheny Power assured the City that it would provide less expensive electricity than Duquesne Light Company to the Redevelopment Zones. Both Allegheny Power and the City knew that the permission of the PUC was required before Allegheny Power could furnish electricity. In July 1996, both the City and Allegheny Power agreed to apply to the PUC for the latter to provide electricity to the Redevelopment Zones. On September 4, 1996, the City filed a petition supporting Allegheny Power's provision of electricity to the Redevelopment Zones. On September 9, 1996, Allegheny Power filed its own petition in this matter and represented to the PUC that an "alternative electric supply would attract economic development to the Redevelopment Areas and would foster economic growth[.]" (J.A. at 6.)

Claiming that it had the exclusive right to provide electricity to the City, Duquesne Light Company intervened

---

1. We accept all of the City's allegations as true in reviewing the motion to dismiss. Fuentes v. South Hills Cardiology, 946 F.2d 196, 201 (3d Cir. 1991) (citation omitted).

26

on September 27, 1996, opposing the petitions filed by the City and Allegheny Power. On October 21, 1996, Allegheny Power filed an answer, claiming that it also had the right to provide electricity to the Redevelopment Zones. After these preliminary matters had been addressed, on October 28, 1996, Allegheny Power formally applied for a certificate of need, which would enable it to provide electricity to the Redevelopment Zones. In its application, Allegheny Power claimed that its prices would be substantially lower than Duquesne Light Company's, stating: "It is certain that the potential for developing new, incremental electrical load in the Redevelopment Zones will be enhanced substantially if electricity prices therein are as low as possible." (Id.)

On November 18, 1996, the City solicited bids from Allegheny Power and Duquesne Light Company to provide power to the Redevelopment Zones. As the majority points out, Allegheny Power significantly under-bid Duquesne Light Company. While the ALJ received testimony on the application in late March 1997, further hearings were scheduled for June 9, 1997.

Less than two weeks later, on April 7, 1997, Duquesne Light Company and Allegheny Power announced that they had agreed to merge. Two days earlier, on April 5, 1997, Allegheny Power and Duquesne Light Company agreed not to make any filings with governmental entities until they consulted with each other; not to change their regulated charges or rates without first discussing it with each other; and not to make any agreement or filing with respect to a rate change or charge without first consulting each other.

After deciding to merge, on April 28, 1997, Allegheny Power and Duquesne Light Company requested a stay of the proceedings on Allegheny Power's application for a certificate of need. The ALJ denied the stay, noting the need for an expeditious decision. On June 6, 1997, Allegheny Power petitioned the ALJ for leave to withdraw its application. The ALJ granted the petition on June 24, 1997. The City then commenced this action alleging, in substance, that Allegheny Power and Duquesne Light Company conspired to deprive the City of the opportunity to obtain less expensive electricity in violation of Section 1 of the Sherman Act and Section 7 of the Clayton Act.

27

The facts alleged by the City are sufficient to show that Allegheny Power and Duquesne Light Company conspired to deprive the City of an opportunity to obtain less expensive electricity. In my view, this conspiracy violated both the Sherman and Clayton Acts. Unlike the majority, I am not persuaded that the PUC's failure to act on Allegheny Power's application immunizes these conspirators from antitrust liability. After all, the conspiracy deprived the PUC of an opportunity to review the application. [2] As the Seventh Circuit aptly pointed out, "[w]e know of no rule that states that the parties must be in head-to-head competition in the relevant market (as opposed to head-to-head competition for the relevant market) before the antitrust laws will apply." Fishman v. Estate of Wirtz, 807 F.2d 520, 531 (7th Cir. 1986) (emphasis in original).

The Clayton Act prohibits mergers that substantially lessen competition or tend to create monopolies in any line of commerce in any section of the country. There can be no doubt that the proposed merger in this case violates the Clayton Act. Allegheny Power and Duquesne Light Company are the only utility companies that could feasibly provide electricity to the Redevelopment Zones. Consequently, the proposed merger substantially lessens competition and creates a monopoly in the relevant market.

_____

2. The majority, however, argues "now that all parties, including the City, have withdrawn from the regulatory proceedings, an injunction would not alter the City's current situation." In essence, the majority argues that because the City withdrew from the PUC proceedings, the issue is moot as to whether an injunction should be granted. However, once Allegheny withdrew its application, there was no point for the City to continue with its application. As the appellees point out themselves, Allegheny had to obtain approval from the PUC to enlarge its certificate of convenience. See Makovsky Bros., Inc. v. Pennsylvania Public Utility Comm., 423 A.2d 1089, 1092 (Pa. Commw. 1980). The City alone, as the consumer, could not petition the PUC to obtain lower utility prices. Lukens Steel Co. v. Pennsylvania Public Utility Comm., 499 A.2d 1134, 1140 (Pa. Commw. 1985). Thus, once Allegheny withdrew, under Pennsylvania law, there was no point for the City to continue with its application. Instead, the City filed suit in federal district court. Although the law is changing in Pennsylvania as utility competition becomes a reality, there is no indication that the City could have proceeded ex parte before the PUC to ensure that Allegheny provide lower electricity rates.

28

The Sherman Act addresses agreements in restraint of trade. In this case, there was such a restraint. The merger agreement destroyed the City's opportunity to obtain less expensive electricity. In this case, the City's allegations support the view that there was such a restraint. According to these allegations, the merger agreement destroyed the opportunity to obtain less expensive electricity. A factfinder might well determine that this opportunity was more than speculative; it was real enough to cause Allegheny Power to file its application; it was real enough to cause Duquesne Light Company to oppose the application; and it was real enough to convince Allegheny Power and Duquesne Light Company that a merger was the most effective way of avoiding cost competition.3 In short, "the injury alleged by [the City] was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause." Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125 (1969).

I am concerned that today's decision sends the wrong message that similarly situated conspirators will not be held accountable for their anti-competitive activities. After submitting bids, both Allegheny Power and Duquesne Light Company knew the price at which each company would provide electricity to the City. When Allegheny Power withdrew its bid, Duquesne Light Company was assured that competition would be lessened and that its higher price would prevail.

In my view, the majority does not sufficiently distinguish between the City's S 4 and S 16 claims under the Clayton Act. Even if one concedes that the claim for monetary damages under the Clayton and Sherman Acts presents a close question, there can be no doubt that the City has standing to pursue its requested injunctive relief under S 16 of the Clayton Act. It is well settled in the Third Circuit that, unlike a claim under S 4 of the Clayton Act for

_____

3. Certainly the amount of damages that the City might recover may be limited by the fact that the PUC would not have approved the application, but this fact goes to the amount of damages that can be recovered rather than whether an antitrust violation has been committed.

29

monetary damages, "a claim for injunctive relief does not present the countervailing considerations--such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses--that the Supreme Court emphasized when limiting the availability of treble damages" in a S 4 Clayton Act claim. Mid-West Paper Prods. Co. v. Continental Group, 596 F.2d 573, 591 (3d Cir. 1979). Consequently,

> In contradistinction to S 4, S 16 does not ground injunctive relief upon a showing that "injury" has been already sustained, but instead makes it available "against threatened loss or damage." Furthermore, S 16 does not state that the threat must be to the plaintiff's "business or property," and courts accordingly have held that non-commercial interests are also protected. . . . [C]ourts have held that for purposes of S 16 the complainant "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur," and that a person may have standing to obtain injunctive relief even when he is denied standing to sue for treble damages. Indeed, the test for standing under S 16 has been framed in terms of a proximate cause standard that is "less constrained" than that under S 4 and which might in fact be no more rigorous than the general rule of standing.

Mid-West Paper Prod. Co. v. Continental Group, 596 F.2d 573, 591-92 (3d Cir. 1979) (emphasis in original) (footnotes omitted). Therefore, the district court can still fashion injunctive relief that will bar the merger, require Allegheny Power to reinstate its application to the PUC to furnish power to the City's Redevelopment Zones, even if the merger is permitted to go through,4 or alternatively, to give

_____

4. In an October 17, 1997 letter from Allegheny Power's president, Alan Noia, to Pittsburgh Mayor Thomas Murphy, Noia states: "I am, therefore, committing to you that, if the . . . PUC grants the City's request . . . to allow utilities other than Duquesne Light Company to provide electric service to the two economic development zones, subject to PUC approval, . . . [Allegheny Power] will expand its service territory to include the economic development zones." (J.A. at 499a.) This letter was sent after the proposed merger.

such other relief as will ensure that the City obtains the advantage of competitive pricing.

For the reasons stated above, I respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

31