**Lukens Steel Company, A Division of Lukens, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.**

Argued September 11, 1985, before President Judge Crumlish, Jr., and Judges Rogers, Craig, Mac-Phail, Doyle, Colins and Palladino.

*Edward J. Riehl, McNees, Wallace & Nurick,* of Counsel: *James L. Slattery,* General Counsel of Lukens Steel Company, for petitioner.

*Kandace Foust Melillo,* Assistant Counsel, with her, *Louise A. Knight,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Irwin A. Popowsky,* Assistant Consumer Advocate, with him, *David M. Barasch,* Consumer Advocate, for intervenor, Office of Consumer Advocate.

*Gerald Gornish,* with him, *Mark R. Rosen,* of Counsel: *Wolf, Block, Schorr and Solis-Cohen,* and *Edward G. Bauer, Jr.,* Vice President and General Counsel, and *Eugene J. Bradley, Jr.,* Associate General Counsel, for intervenor, Philadelphia Electric Company.

*G. D. Caliendo,* with him, *Bridget E. Grady* and *David J. Dulick,* for intervenor, Pennsylvania Power & Light Company.

OPINION BY JUDGE ROGERS, November 4, 1985:

This is a petition for review of the opinion and order of the Pennsylvania Public Utility Commission

(PUC), entered January 17, 1984, which denied the petitioner Lukens Steel's (Lukens) request for a declaration by the PUC that the acquisition by Lukens of certain property owned by Pennsylvania Power and Light (PP&L) for the purpose of permitting Lukens to take delivery of PP&L electric service under Tariff Rate LP-6, is consistent with the public interest.

Lukens produces a full line of plate steel products, rolled and finished slabs or ingots cast in its electric melt shop located at Coatesville, Chester County. This plant currently receives electrical service from Philadelphia Electric Co. (PECO) under Tariff Rate HT. PECO has been granted a certificate of convenience and necessity by the PUC, under the provisions of Sections 1101 and 1102(a) of the Public Utility Code, 66 Pa. C. S. §§1101 and 1102(a), to provide electric service to all customers situated in PECO's defined service area. Lukens is situated in PECO's service area. No other utility has been granted the authority to provide retail electric service in PECO's territory.[1]

Lukens claimed that the cost of electricity supplied by PECO during times of Lukens' normal production, is unacceptable; that Lukens must either reduce production, with an attendant reduction in its work force, or secure electrical power at a lower cost. Such lower cost electrical power is available, according to Lukens, by purchasing electrical power from PP&L instead of

---

[1] A Certificate of Public Convenience and Necessity makes it lawful for a public utility to provide service within a defined territory, and imposes on the public utility an obligation to provide service in that territory. *See Bland v. Tipton Water Co.*, 222 Pa. 285, 71 A. 101 (1908). A Certificate of Public Convenience and Necessity does not necessarily grant an exclusive right to serve a particular geographic area. *See, Western Pennsylvania Water Co. v. Pennsylvania Utilities Commission*, 10 Pa. Commonwealth Ct. 533, 311 A.2d 370 (1973); *Pennsylvania Power and Light Co. v. Public Service Commission*, 112 Pa. Superior Ct. 500, 171 A. 412 (1934).

PECO. To obtain service from PP&L, Lukens proposes to acquire a right-of-way, the Face Rock Newlinville Right-of-Way, and a 66 KV transmission line from PP&L. These facilities extend approximately ten miles from a point near Lukens' facility at Coatesville to PP&L's service territory in Lancaster County. They are owned by PP&L. The right-of-way does not have an explicitly defined width over its entire length. The line is presently de-energized for the majority of its length. More than half of the line is located in PECO's service territory.

PP&L has agreed to transfer the right-of-way and transmission line to Lukens only upon the issuance of a PUC declaration that the acquisition of the property for the purpose of delivery of service by PP&L to Lukens, is in the public interest. PP&L has also required Lukens to pay all costs associated with the construction by PP&L of the 230 KV transmission line which would be necessary to connect Lukens to PP&L's system. This line will be approximately sixteen miles long, would take five years to design and build and will require PUC siting approval. Lukens would be required to construct and maintain an additional transmission line from the point of connection with PP&L at its Atglen substation to the Coatesville plant, using, to a large degree, the transmission line corridor acquired from PP&L.

After filing and other proceedings not necessary to describe, the matter was assigned to Administrative Law Judge ROBERT A. CHRISTIANSON, who concluded that the acquisition by Lukens of property from PP&L for the purpose of enabling Lukens to take PP&L electric service, was consistent with the public interest and should be permitted. Exceptions to the Initial Decision were filed by the PUC, Lukens, PECO, and Office of Consumer Advocate (OCA).

After a public meeting, the PUC entered the order here appealed which provided:

1. That the petition of Lukens Steel Company for an order declaring the acquisition of certain property of Pennsylvania Power & Light Company for the purpose of taking delivery of Pennsylvania Power & Light Company service to be in the public interest is denied.

2. That Lukens, Philadelphia Electric Company and Pennsylvania Power & Light Company are directed to meet with the Commission's Bureau of Rates and the Bureau of Conservation . . . for the purpose of investigating possible sources of lower cost electricity which might be available to Lukens.

Lukens filed the petition for review of that order now before us. PECO, OCA and PP&L support the PUC's order.

We may not disturb an order of the PUC unless we determine that constitutional rights were violated, an error of law was committed or necessary findings of fact were not supported by substantial evidence. *Teltron, Inc. v. Pennsylvania Public Utility Commission*, 83 Pa. Commonwealth Ct. 407, 477 A.2d 599 (1984); *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission*, 78 Pa. Commonwealth Ct. 402, 467 A.2d 1367 (1983); *Western Pennsylvania Water Co. v. Commonwealth Public Utility Commission*, 10 Pa. Commonwealth Ct. 533, 311 A.2d 370 (1973).

Lukens first contends that the PUC committed an error of law in failing to conclude that Lukens has a "presumptive right" to its requested relief since Lukens would be taking delivery of PP&L electricity in PP&L territory and importing this electricity to its Coatesville plant via Lukens' own private transmission facilities; by obtaining a point of delivery within

PP&L's territory, it has become a true customer of PP&L which PP&L then has the duty under the law to serve. It relies on: *Bland v. Tipton Water Company,* 222 Pa. 285, 71 A. 101 (1908) ; *Columbia Gas of Pennsylvania. v. Peoples Natural Gas Company,* 44 Pa. P.U.C. 308 (1969); *Northwestern Mining and Exchange Company of Erie v. West Penn Power Company,* 25 Pa. P.U.C. 468, 61 P.U.R. (N.S.) 186 (1945) ; *Borough of Schuylkill Haven v. P.P. & L.,* 12 Pa. P.U.C. 567, 3 P.U.R. (N.S.) 127 (1934). These cases are distinguishable; in each the customer owned property at the point of delivery in the utility's franchise territory. The tribunals in those cases reasoned that these customers were members of the public in the service territory where they owned property and were therefore entitled to public utility service there. *See e.g. Bland v. Tipton Water Co.,* 222 Pa. at 289; *Columbia Gas of Pennsylvania v. Peoples Natural Gas Company,* 44 Pa. P.U.C. at 311. This condition does not exist in this case. Moreover, in none of the instances cited was the PUC asked, as it here is, to sanction the transfer of public utility property to a customer. Lukens admits that it owns no property in PP&L's service territory which could serve as a point of delivery. Indeed its purpose in seeking a declaration that it is in the public interest that it obtain property from PP&L is to own property in PP&L's service area.

Lukens next contends that the PUC erred in concluding on the record made that its proposal is not necessary or proper for the service, accommodation, convenience or safety of the public. We disagree. The power of the PUC to grant certificates of public convenience and to establish territories in which a public utility may serve is exclusive. Section 1103(a) of the Public Utility Code, 66 Pa. C. S. §1103(a) states that:

Every application for a certificate of public convenience shall be made to the Commission.

. . . A certificate of public convenience shall be granted by order of the Commission, only if the Commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience or safety of the public. The Commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable.

"The question [in this class of case] is not whether the granting of the application will be for the convenience and accommodation of some of the public, but whether it will be for the convenience, accommodation and advantage of the public generally and considered as a whole." *Incorporations of Service Gas Company v. Public Service Commission*, 126 Pa. Superior Ct. 381, 393, 190 A. 653, 658 (1937) (quoting *Beaver Valley Service Company v. Public Service Commission et al.*, 122 Pa. Superior Ct. 221, 225, 186 A. 304, 306 (1936)).

It is not necessary to discuss the evidence in great detail because PUC's findings reproduced later sufficiently describe it in sufficient detail. Lukens introduced testimony and documentary evidence tending to show that it would save money if it could have PP&L's less expensive service and that these savings would avoid the necessity of reducing its operations and the number of its employees. Members of the business consulting firm of Arthur D. Little, Inc. testified to the poor consequences to Lukens and the region were Lukens to be denied access to a less expensive source of electricity; that Lukens would be placed at an economic disadvantage in the competitive marketplace; that it would be required to reduce steel production with attendant loss of jobs, reduction in area retail sales and the local tax base.

Lukens' president testified that the options available to Lukens were to reduce production of its electric melt shop and purchase semi-finished steel elsewhere at a cost in jobs, seek an alternative source of electricity, or build melting facilities elsewhere.

Some doubt was shed on some of Arthur D. Little, Inc's evidence by discovery on cross-examination that it was based on incorrect data provided by Lukens.

PECO, the PUC trial staff and, notably, PP&L[2] produced expert testimony and other evidence to show that any savings enjoyed by Lukens would be offset by increased rates for both PECO and PP&L customers. One of Lukens' witnesses testified that the negative impact on PP&L customers would be in excess of $190 million. PECO presented evidence that its rate-payers would be subject to an increase in excess of $64 million due to the loss of Lukens' patronage. There were substantial questions raised concerning the physical and economic feasibility of making the connection with PP&L.

The PUC made the following relevant findings of fact:

14. Construction of Lukens' proposed line requires the acquisition of easement rights to define the width of the right-of-way or permit the construction of a new transmission line.

. . . .

18. PECO is not willing to grant Lukens any rights-of-way over PECO fee-owned property.

. . . .

---

[2] PP&L in its brief writes: "The Commission as the sole arbiter of fact, determined these crucial issues adversely to Lukens based upon substantial evidence."

24. Lukens is relying upon the electricity cost differential between PECO and PP&L as projected by its consultant ADL [Arthur D. Little, Inc., who undertook an extensive study of the economic effects of the proposed change in power suppliers] in contending that its transfer to PP&L will permit it to recoup its transmission line project investment and will afford it the financial flexibility to preserve jobs.

25. ADL's [Lukens' expert] revised savings projections for Lukens totals $125,480,000 during the seven-year study period (1986-1992), exclusive of the transmission line project investment, for an average annual savings of approximately $18 million.

26. In projecting Lukens' savings, ADL assumed a Lukens' annual electric consumption of *** GWH[3] and a *** MW demand. The *** GWH figure is based on ADL's assumption that Lukens' steel production in the mid-1980's will return to a normal year level (1979) of *** melt tons (*** shipped tons). Actual 1982 shipments were *** tons.

27. ADL assumes that Lukens' production will return to the 1979 level by the mid-1980's.

28. Both PECO and PPL performed their own rate projections for Lukens for the years 1986-1992, assuming an electric consumption of *** GWH and *** MW demand. The utilities' rate projections resulted in a total savings of $40.8 million during the study period, for an average annual savings of $5.8 million.

. . . .

---

[3] *** Indicates confidential data which was deleted from the opinion and order.

31. PECO pointed out several errors in ADL's analysis regarding its projection of PP&L's rate and these errors were not challenged by Lukens.

32. PECO also pointed out errors in regard to ADL's projections of its future rates for the study years 1986-1992.

. . . .

35. The present value in 1986 dollars of Lukens' $40.8 million savings assuming it transfers to PP&L, (using the utilities' rate projections) is $21.9 million from 1986 to 1992. This $21.9 million savings is insufficient to allow Lukens to recover a $50 million present value transmission line project investment.

36. Lukens may not achieve the financial flexibility it says it needs to preserve jobs if it transfers to PP&L since it may not recoup its original investment in the transfer.

37. Lukens will not achieve the average 1.7ckwh savings differential between PECO and PP&L which it says it needs over ten years to recoup its transmission line project investment, nor will it recoup the average 4.4ckwh differential which PECO claims is needed in order to afford Lukens a 15% after-tax rate of return.

. . . .

45. PECO and PP&L are members of the Pennsylvania-Jersey-Maryland (PJM) Interconnection, a power pool comprised of eleven electric utilities serving portions of Pennsylvania, New Jersey, Maryland, Delaware, the District of Columbia and Virginia.

46. On PJM, the generating units of the members are dispatched in order of increasing cost to meet the total supply needs of the system. Thus, the generating units and bulk power transmission facilities of the individual companies are pooled and operated as if they were a single system.

. . . .

48. Since there are no capacity or production cost changes on PJM as a whole as a result of Lukens' transfer to another PJM member, total costs to serve all customers of the PJM companies do not change.

49. To the extent that the revenues from one customer, Lukens are reduced, the revenues from other customers elsewhere on the PJM interchange must be increased to meet the total costs to serve all customers on the interchange.

50. According to ADL's utility impact assessment, there would be a $190,231,000 total additional revenue requirement impact from 1986-1992 on PP&L's customers, exclusive of Lukens, as a result of the addition of Lukens' load.

51. According to PP&L's figures, the impact of the addition of Lukens' load would increase its net revenue requirements by a total of $100.8 million from 1986-1992.

. . . .

53. PP&L's total costs will increase with the addition of Lukens' load due primarily to an increase in its direct cost of power.

. . . .

55. Since PP&L would have its revenues from interchange sales reduced by the level of lost split-savings profit, the result would be an increase in the energy cost rate (as it is presently structured) to all classes of PP&L customers.

57. PECO produced evidence that its own customers would be subject to $64.1 million in additional rates for the period 1986-1991 due to the transfer of Lukens to PP&L.

58. Using PECO's projections, a large customer on PECO's system using 500 GWH annually could be subject to an increase of $1,000,000 during the seven-year study period (1986-1992).

59. Even assuming that Lukens and ADL are correct about the employment effect of prohibiting a Lukens' transfer, the employment losses resulting from allowing the transfer may be potentially greater. This is due to the effects of rate increases on residential, commercial, and industrial customers. Industries may choose not to locate here and residential and commercial customers would likely reduce purchases of goods and services, resulting in decreased output and employment.

The PUC's conclusions of Law included:

7. Lukens has not proven that the electricity cost savings resulting from the transfer to PP&L is sufficient to justify Lukens' transmission line project expenditure, thereby enabling Lukens to save jobs.

8. Lukens has not proven that its future steel production, and therefore its employment level, is dependent solely upon its electric supplier.

9. Lukens should have modeled, but failed to model, the cost effects of its proposed transfer on other PJM member utilities (other than PECO and PP&L) and their customers.

. . . .

11. Lukens has not proven that its proposed transfer is in the interests of other Pennsylvania ratepayers.

12. Lukens has not met its burden of proving that the acquisition of certain property of Pennsylvania Power & Light Company for the purpose of taking delivery of Pennsylvania Power & Light Company service is in the public interest.

A review of the record demonstrates that substantial evidence supports the PUC's findings which in turn provide a firm basis for its conclusion that Lukens' proposal is not necessary or proper for the service, accommodation, convenience, or safety of the public.

Lukens' final contentions are (1) that the Commission's decision precludes Lukens from obtaining lower cost electricity from any source other than PECO and therefore "runs counter to the policies embodied in antitrust laws, and counter to the regulatory policies which underlies earlier Pennsylvania court and agency decisions. . . .," and (2) that the order of the PUC directing Lukens, PECO, PP&L, and the Commission's Bureau of Rates and the Bureau of Conservation, Economics and Energy Planning to meet within 30 days to investigate other sources of "lower cost electricity" is of no practical effect and results in a "taking" of Lukens' property without compensation as well as a denial of Lukens' equal protection rights. The first of these questions was not raised before the PUC and may not be raised here. 2 Pa.

C. S. §703(a). The assertion in the second question that the PUC order is of no practical effect is not a ground for disturbing it. Indeed the order may be ineffective against Lukens because PUC seems not to have the authority to order a consumer to investigate sources of "lower cost electricity." 66 Pa. C. S. §501. Finally, the second question is inscrutable in the absence of a description of what property of Lukens has been or will be taken by requiring it to discuss the cost of electricity with a PUC bureau.

Order affirmed.

ORDER

AND Now, this 4th day of November, 1985, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.

Judge COLINS dissents.