# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Middletown,                    :
             Petitioner               :  CASES CONSOLIDATED
                                 :
        v.                          :   No. 1450 C.D. 2021
                                 :
Pennsylvania Public Utility               :
Commission,                               :
             Respondent               :


Metropolitan Edison Company,              :
             Petitioner               :
                                 :
        v.                          :   No. 36 C.D. 2022
                                 :   Argued:  December 15, 2022
Pennsylvania Public Utility               :
Commission,                               :
             Respondent               :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER        FILED:  August 7, 2023

Before this Court are the cross-petitions for review of the Borough of Middletown (the Borough) and Metropolitan Edison Company (MetEd) seeking appellate review of the Opinion and Order (Opinion) of the Pennsylvania Public Utility Commission (Commission) that upheld, as modified, the decision of an Administrative Law Judge (ALJ) granting in part and denying in part the Petition for Declaratory Order (Petition) filed by Librandi Machine Shop, Inc. (Librandi).[1]  In

---

[1] The Opinion was initially issued on February 25, 2021, as a tentative decision, pending potential receipt of comments from a third party, the Susquehanna Area Regional Airport Authority.  Having not received any comments, the Opinion became final on March 17, 2021.

the Petition, Librandi sought a declaratory order allowing it to change electric distribution service (EDS) providers from the Borough, which currently provides Librandi with EDS, to MetEd, from which it previously received EDS between 1994 and 1997. Both the Borough and MetEd opposed the Petition. The Commission held that Librandi was entitled to a declaration that it could obtain electric service from MetEd, without the Borough's consent, and that MetEd was certificated to provide such service because MetEd's authority to provide service was a matter within the Commission's jurisdiction and existed from "grandfathered" rights MetEd had acquired pursuant to Section 103(a) of the Public Utility Code (Code),[2] 66 Pa.C.S. § 103(a). The Commission also concluded that granting the Petition would not cause unnecessary duplication of facilities or impermissible competition between the Borough and MetEd. MetEd and the Borough requested reconsideration, which the Commission denied on the merits.

On appeal, the Borough asserts the Commission erred, abused its discretion, and/or reached conclusions not supported by substantial evidence when it permitted Librandi to obtain electric utility service from MetEd because neither MetEd nor any of its predecessors were authorized, by a certificate of public convenience (CPC) or otherwise, to provide electrical service to Librandi. The Borough further challenges the Commission's conclusions that granting the Petition would not violate the

---

[2] Section 103(a) of the Code states:

**Existing law continued**.--Except as otherwise specifically provided in this part, it is the intention of this part to continue existing law. Any public utility, contract carrier by motor vehicle, or broker rendering service or having the right to render service on the day preceding the effective date of this part shall be entitled to the full enjoyment and the exercise of all and every right, power and privilege which it lawfully possessed on that date.

66 Pa.C.S. § 103(a).

Borough Code,[3] put the Borough and MetEd in direct competition, or cause unnecessary duplication of electric facilities. MetEd similarly argues the Commission erred in granting the Petition based on its finding that MetEd had an unconditional right and obligation to serve Librandi, and others in the Borough, through grandfathered rights arising from historic certificates and/or tariffs that contradict its current Commission-approved CPC. The Commission, and Librandi, which has intervened, respond that the Commission properly found that MetEd had the authority and obligation to provide Librandi EDS and that doing so would not result in the unnecessary duplication of services or direct competition between MetEd and the Borough.

## I.   BACKGROUND

### A. Overview

#### 1. The Parties

Librandi, a Pennsylvania corporation, operates machine shops in three locations, including one located in Middletown, Pennsylvania (Facility). (Commission Opinion and Order (Op. & Order) at 3.) The Facility is located on property owned by the Susquehanna Area Regional Airport Authority (SARAA), which Librandi leases. (*Id.* at 3, 18.)

MetEd is a certificated public utility. (*Id.* at 4.) MetEd's predecessor initially received a CPC in 1923 (1923 CPC), which authorized the predecessor to provide electric service to end-users in the Borough if it obtained the Borough's consent and approval from the Commission. (*Id.* at 21.) Relevantly, the 1923 CPC provided:

> the Metropolitan-Middletown Electric Company, its successors and assigns, shall not without the approval of the Commission and the

---

[3] 8 Pa.C.S. §§ 101-3501.

consent of the Borough . . . hereafter first had and obtained, furnish service to any consumer or consumers within its corporate district or territory except electric companies affiliated with the Metropolitan-Middletown Electric Company, its successors or assigns . . . .

(*Id.*; Reproduced Record (R.R.) at 298a.) As reflected in a 1924 CPC, MetEd acquired Metropolitan-Middletown Electric Company, and "MetEd succeeded to the rights, powers, and responsibilities[] of the predecessor company." (Op. & Order at 60 n.38.) MetEd provides EDS to two end-user customers in the Borough, a parking lot across from Librandi's property and a water tower on Librandi's property, that are located on the SARAA Property, based on an alleged legacy authority, and those users have not sought to change EDS providers. (*Id.* at 19.) MetEd's tariff identifies the Borough as part of its service area. (*Id.* at 20.)

The Borough is organized and exists under the Borough Code. (*Id.* at 3.) It owns and operates its own municipal EDS system that services approximately 97 industrial, 233 commercial, and 3,950 residential customers located within the Borough, and all those located within the Borough are eligible to use its EDS system. (*Id.*) The Borough "provides bundled, retail electric service to businesses and residences within its corporate boundaries." (*Id.* at 4.) The Borough contends it has the exclusive right to provide EDS within its territorial boundaries, which includes the Facility, and can preclude MetEd from providing service to the Facility without its consent. (*Id.* at 21-22.)

Librandi completed construction of the Facility in March 1994 and sought EDS from MetEd, which agreed to supply and did supply at the rates provided in its tariffs until May 1997. (*Id.* at 4, 18.) Whether this service was given with the Borough's consent is disputed. (*Id.*) Borough representatives approached Librandi in April 1996 and indicated the Borough could provide energy at a lower cost than

4

MetEd. Librandi decided to switch EDS providers in 1997, and, although MetEd initially objected, it ultimately issued a "non-interference letter" in April 1997, indicating it would not contest the switch of service providers. (*Id.* at 4-5.) MetEd did not file any application to abandon or transfer service related to the Facility, nor did it maintain any of the facilities that had previously provided service to the Facility. (*Id.* at 20.) In order to install and maintain facilities to receive EDS from the Borough, Librandi sought and received an easement from the Commonwealth. (*Id.* at 5.)

### 2. The SARAA

The Commission's determination that MetEd has grandfathered or "legacy" authority to provide Librandi EDS without the Borough's consent is premised on the existence of EDS used by MetEd's predecessors on the SARAA Property. Thus, a review of the history of the SARAA Property is necessary. "The SARAA [P]roperty was formerly the Olmsted Air Force Base" (Olmsted AFB). (*Id.* at 3.) The United States government (federal government) initially owned the SARAA Property, which includes the Harrisburg International Airport (HIA), since 1898, operating it first as a part of the Signal Corps, later as Middletown Field, and, ultimately, as Olmsted AFB. (*Id.* at 18, 70 (quoting *Cap. City Cab Serv., Inc. v. Susquehanna Area Reg. Airport Auth.*, 70 Pa. D. & C. 4th 501, 503-04 (2004), 2004 WL 3401755).) Olmsted AFB was decommissioned in 1969 but retained some military function, as the Pennsylvania Air National Guard began to, and still, functions on the property. (*Id.* at 18, 70 (citing *Cap. City Cab Serv.*, 70 Pa. D. & C. 4th at 503-04).) Olmsted AFB was renamed HIA, converted to civilian airport usage, and became the property of the Commonwealth of Pennsylvania (Commonwealth), Department of Transportation (DOT). (*Id.* at 19, 70 (citing *Cap. City Cab Serv.*, 70 Pa. D. & C. 4th

at 503-04).) In 1998, DOT ceded ownership of HIA to SARAA, which was a newly formed municipal authority comprised of representatives from the cities of Harrisburg and York, the counties of Cumberland, Dauphin, and York, and the townships of Fairview and Lower Swatara. (*Id.* at 22, 70 (citing *Cap. City Cab Serv.*, 70 Pa. D. & C. 4th at 503-04).)

Olmsted AFB had an internal electric distribution system to serve the buildings and facilities on the Base. (*Id.* at 19, 71.) This system was "non-jurisdictional to the Commission," as it "was, both, federally owned and served the Base – *i.e.*, the system was not accessible to the general public." (*Id.* at 50.) The federal government transferred the internal EDS system to the Commonwealth in 1967. (*Id.* at 19.) MetEd acquired, via real estate transfer, the EDS contained within Olmsted AFB from the Commonwealth around 1968 or 1969. (*Id.*) MetEd has not located a CPC evidencing its acquisition of Olmsted AFB's internal electric distribution system. (*Id.* at 20.)

## B. *The Petition and the ALJ Recommended Decision*

Librandi eventually became dissatisfied with the Borough's rates and customer service, which, at times, was more than double what it had been paying MetEd. (*Id.* at 5.) Additionally, the Borough would not afford its customers the opportunity to participate in the Electricity Generation Customer Choice and Competition Act of 1996 (Competition Act), 66 Pa.C.S. §§ 2801-2812, thereby preventing Librandi from choosing its electric generation service provider. (*Id.*) Between 2012 and 2014, Librandi discussed, or attempted to discuss, obtaining EDS from MetEd, and, at one point, received a work order from MetEd, but no cost estimate. (*Id.* at 6.) Librandi filed a formal complaint against MetEd, which it later withdrew upon its receipt of a cost estimate from MetEd. (*Id.* at 6-7.) Librandi

6

additionally filed civil actions against MetEd and the Borough, respectively, seeking to switch EDS providers.[4]  (*Id.* at 7-9.)  In 2015, when Librandi attempted to meet with Borough and MetEd representatives to schedule and coordinate the change in providers, MetEd indicated that, per its 1923 CPC, it needed the Borough's consent for the requested service.  (*Id.* at 9-10.)  The Borough indicated it wanted to retain Librandi as a customer and maintained it had an exclusive right to serve Librandi under the Borough Code.

Librandi filed a petition in February 2018, seeking a declaration from the Commission "that[]  (1) Librandi ha[d] the right to obtain electrical utility services at the Facility from MetEd; and (2) [the Borough] c[ould not] prevent or impede MetEd from serving Librandi by refusing to disconnect the Borough's own electrical utility services."  (*Id.* at 10.)  It subsequently filed an amended petition, the Petition at issue, on March 28, 2018, to which MetEd filed an answer and the Borough filed an answer and preliminary objections.  After denying the preliminary objections, the ALJ identified the remaining issues as whether:  Librandi is within MetEd's service territory as defined by MetEd's tariffs and other Commission filings; and Librandi obtaining EDS from MetEd would result in direct competition between the Borough and MetEd and/or the unnecessary duplication of services in order to disconnect the Facility from the Borough's facilities and connect the Facility to MetEd's facilities.  (*Id.* at 12.)  The ALJ resolved various prehearing motions and held an evidentiary

---

[4] Librandi averred MetEd breached its duty to provide Librandi service under Section 1501 of the Code, 66 Pa.C.S. § 1501, and had been discriminating in its service under Section 1502 of the Code, 66 Pa.C.S. § 1502.  (Op. & Order at 7-8.)  Librandi alleged the Borough was charging excessive fees for electricity and sought a court order directing the Borough to take steps necessary to allow for an orderly and safe disconnection from the Facility.  (*Id.* at 8.)  These cases were consolidated, and the Court of Common Pleas of Dauphin County invoked the Primary Jurisdiction Doctrine to allow the Commission to make certain initial determinations.  (*Id.*)

hearing at which the parties submitted written testimony and exhibits and cross-examined witnesses that established the above discussed facts.

On February 13, 2020, the ALJ issued a Recommended Decision. Therein, the ALJ found that, pending a determination of Librandi's geographic location (whether it was entirely within the Borough), Librandi established its right to a declaration that switching its EDS provider from the Borough to MetEd would not cause unnecessary duplication of facilities or impermissible competition between the Borough and MetEd. However, the ALJ denied the request for a declaration that Librandi was located within MetEd's service territory, rather than in the Borough's territory, finding that this issue was within the jurisdiction of the local court of common pleas. After such court made its determination, the ALJ explained Librandi would be allowed to refile a new petition for declaratory order on that issue.

## C. The Commission's Opinion

All three parties filed exceptions to the ALJ's Recommended Decision. The Commission granted Librandi's exceptions in part and denied the exceptions of the Borough and MetEd. The Commission adopted the ALJ's Recommended Decision that allowing Librandi to obtain electric service from MetEd would not cause unnecessary duplication of facilities or result in impermissible direct competition. The Commission modified the ALJ's Recommended Decision by holding that Librandi was entitled to a declaration that it could obtain electric service from MetEd, without the Borough's consent, and MetEd was certificated to provide such service because MetEd's authority to provide service was a matter within the Commission's jurisdiction and not dependent on Librandi's location. (Op. & Order at 24-26.) The Commission found that the resolution of the contested issue, the right to serve an end-user customer between a certificated utility and a borough, was

within its jurisdiction, and required the interpretation of MetEd's authority. (*Id.* at 27.)

The Commission concluded that Librandi was within MetEd's service territory, as defined by its tariffs and filings with the Commission, including MetEd's 1923 CPC, regardless of Librandi's actual geographic location. The Commission indicated nothing in the 1923 CPC precluded service because MetEd had grandfathered or legacy rights to provide EDS to the SARAA Property that was located within the Borough, a fact that MetEd's witness admitted, because an electric distribution system had been located on what became the SARAA Property since before 1900, which was ultimately transferred to MetEd around 1967 or 1968. (*Id.* at 29-30, 52-53.) The Commission held that the electric distribution system became MetEd assets upon that sale, and MetEd provided electric services through that system, notwithstanding that no CPC approved that transfer or those operations. (*Id.*) Because the federal government originally exercised its rights and authority to provide EDS on Olmsted AFB, the Commission reasoned MetEd acquired those rights and that authority, and the electric distribution facilities came within the Commission's jurisdiction and authority, when acquired by MetEd. (*Id.* at 29, 55.) Nor could MetEd and the Borough alter MetEd's service territory via a privately negotiated or endorsed contract, as only the Commission has the authority to alter a public utility's service area. (*Id.* (citing *Borough of Lansdale v. Phila. Elec. Co.*, 170 A.2d 565, 566-67 (Pa. 1961)).)

The Commission rejected the Borough's argument that any grandfathered authority was limited as being inconsistent with the facts (the Borough acknowledged that MetEd provides service to two customers located within its boundaries under their grandfathered connections) and law, including *Borough of*

9

*Grove City v. Pennsylvania Public Utility Commission*, 505 A.2d 346, 352 (Pa. Cmwlth. 1986). (Op. & Order at 54-58.) The Commission further pointed to MetEd's Commission-approved tariff, which lists the Borough and Lower Swatara Township in its description of territory, the 1923 CPC (which authorized the provision of service to customers within the Borough), and the evidence that MetEd provided service to Librandi between 1994 to 1997, as well as to other end-users located within the Borough, as support for its conclusion that Librandi is in MetEd's service territory. (*Id.* at 59-60.) The Commission held that a Commission-approved tariff is *prima facie* evidence of an authorization of service, and, therefore, MetEd could provide service to Librandi in the Borough, and the lack of a CPC when the Olmsted AFB facilities were acquired was not an impediment to the Commission having jurisdiction given the *de facto* nature of the service provided. (*Id.* at 60-61.)

The Commission further concluded that neither the 1923 CPC nor the Borough Code affected MetEd's authority to serve Librandi, an authority that arose from MedEd's predecessors in interest's ownership and use of the Olmsted AFB's electric distribution facilities to serve the SARAA Property. (*Id.* at 60-62.) Those electric distribution facilities are now public utility facilities under the Code, having been purchased and used by MetEd to provide electric service, and serve the SARAA Property, which includes Librandi. (*Id.*) Accordingly, the Commission held that MetEd is entitled, under Section 103(a) of the Code, to exercise the rights of its predecessors in interest, which include the right to provide EDS to the SARAA Property. (*Id.* at 62-68.) The application of this grandfathered authority in a territory where a municipal corporation may also have authority, does not, the Commission held, conflict with the Borough Code. (*Id.* at 64, 68-69.) Because the SARAA Property, which includes Librandi, falls within MetEd's service area, the

10

Commission concluded no Borough consent is needed for MetEd to exercise its authority under the 1923 CPC. (*Id.* at 70-71.) Finally, the Commission held that this authority, which belongs to MetEd, could not be waived by Librandi when it sought and obtained electric distribution services from the Borough in 1997. (*Id.* at 71-72.) Accordingly, the Commission concluded that Librandi was "permitted to obtain electric utility service from [MetEd] and [MetEd] is authorized pursuant to its present and existing [CPC] to provide electric utility service facilities situated and located on property leased from [SARAA]." (Commission Order ¶ 1(a).)

On the issue of whether permitting Librandi to switch to MetEd would result in the unnecessary duplication of facilities, the Commission rejected arguments that the ALJ erred on these points because this was a matter of overlapping service territories and, in such cases, customer preference is, presumptively, the controlling factor. (*Id.* at 84-85.) Whether this choice is rebutted is determined by the facts of each case, and, in this case, the Commission concluded these considerations did not rebut this presumption. (*Id.*) The Commission pointed to the facts that MetEd has distribution facilities in proximity to Librandi, currently provides service to end-users in the Borough within hundreds of feet of Librandi, provides service to the HIA complex, which is on SARAA Property, and previously removed facilities, via transfer to the Borough, it had used to provide service between 1994 and 1997. (*Id.* at 85-86.) Further, the Commission relied on evidence that Librandi had multiple points of receipt of service in both the Borough and Lower Swatara Township. (*Id.* at 85.) Based on these facts, and the fact that Librandi would be responsible for paying all reasonable costs for switching providers consistent with MetEd's tariffs, the Commission found there would be no unnecessary duplication of facilities. (*Id.* at 85-86.)

11

The Commission further rejected the claims that Librandi switching would result in impermissible direct competition between the Borough and MetEd, determining that there would be no competition that would be contrary to the public interest. (*Id.* at 87.) Noting that there was currently "competition" because there were some electric service providers, including MetEd, that were providing electric services in the Borough, the Commission found the Borough's arguments of no such competition contrary to the facts. (*Id.*) The Commission further held the Borough's contention that Section 2805(b) of the Competition Act, 66 Pa.C.S. § 2805(b), allows it to prohibit electric generation suppliers from serving end-users in the Borough, was without merit because MetEd's entitlement to serve Librandi, as being located on the SARAA Property, arose under the full provisions of the Code. (*Id.* at 87-88.)

MetEd and the Borough requested reconsideration, which the Commission denied on the merits.[5] The Commission held it did not err in concluding that the 1923 CPC did not preclude a finding of dual/overlapping authority on the SARAA Property based on MetEd's purchase of the electric distribution facilities of Olmsted AFB and MetEd's continued provision of EDS to end-users on SARAA Property since that time. (Commission Opinion and Order, December 16, 2021 (Reconsideration Op. & Order) at 27-30.) The Commission explained the stipulation or agreement of non-interference between the Borough and MetEd, entered into in 1997, could not alter the service territory of the regulated utility (MetEd). (*Id.* at 32-33.) The Commission further disagreed that Librandi waived arguments on the issue of whether MetEd's authority was based on grandfathered or legacy rights under

---

[5] The Commission initially granted reconsideration pending review and consideration of the merits. (Commission Opinion and Order, December 16, 2021 (Reconsideration Op. & Order) at 1.)

12

Section 103(a) of the Code because Librandi had consistently taken the position that MetEd was providing service to the SARAA Property, which infers this argument. (*Id.* at 35-36.) It explained that the lack of Commission approval for MetEd to acquire the electric distribution system at Olmsted AFB was not material because, as a matter of law, once MetEd acquired those facilities, they became public utility facilities as defined by Section 102 of the Code,[6] 66 Pa.C.S. § 102. (*Id.* at 36-38.)

The Borough and MetEd now petition this Court for review.

## II.    DISCUSSION

We recognize that "[a]ppellate review of a [Commission] order is limited to determining whether a constitutional violation, an error of law, or a violation of [Commission] procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006). The Court's review of questions of law is plenary. *Id.*

On appeal, the Borough and MetEd contend the Commission erred and/or abused its discretion in finding that MetEd was authorized and obligated to provide electric services to Librandi without the Borough's consent. The Borough further argues the Commission erred in holding that granting the Petition would not put MetEd and the Borough in direct competition or cause the unnecessary duplication

---

[6] Section 102 defines "[f]acilities" as:

> All the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public utility. Property owned by the Commonwealth or any municipal corporation prior to June 1, 1937, shall not be subject to the commission or to any of the terms of this part, except as elsewhere expressly provided in this part.

66 Pa.C.S. § 102.

of electric facilities by requiring MetEd to serve Librandi.[7]  We begin by reviewing the general legal standards applicable for reviewing a Commission order.

### A. General Legal Standards

At issue here is Librandi's petition for a declaratory order, filed pursuant to Section 5.42(a) of the Commission's regulations,[8] 52 Pa. Code § 5.42(a), which the Commission may issue "in its sound discretion . . . to terminate a controversy or remove uncertainty."  Section 331(f) of the Code, 66 Pa.C.S. § 331(f).  Section 332(a) of the Code provides that "the proponent of a rule or order has the burden of proof."  66 Pa.C.S. § 332(a).  Thus, as the moving party here, Librandi bore the burden of proving, by a preponderance of the evidence, that it is entitled to obtain electric utility service from MetEd under the Code.  *Samuel J. Lansberry, Inc. v. Pa. Pub. Util. Comm'n*, 578 A.2d 600, 602-03 (Pa. Cmwlth. 1990).  The preponderance

---

[7] The Borough's Statement of Questions Involved lists five arguments, but its argument section contains headings for only three arguments, two of which we have combined for ease of discussion.  It would appear that the Borough has incorporated at least some of the other two arguments into its other analyses.

[8] Section 5.42(a) of the Commission's regulations states:

(a) Petitions for the issuance of a declaratory order to terminate a controversy or remove uncertainty must:

  (1) State clearly and concisely the controversy or uncertainty which is the subject of the petition.

  (2) Cite the statutory provision or other authority involved.

  (3) Include a complete statement of the facts and grounds prompting the petition.

  (4) Include a full disclosure of the interest of the petitioner.

52 Pa. Code § 5.42(a).

of the evidence is a more likely than not standard. *Popowsky v. Pa. Pub. Util. Comm'n*, 937 A.2d 1040, 1055 n.18 (Pa. 2007). Further, the burden of proof is comprised of two, distinct burdens: the burden of production and the burden of persuasion. *Riedel v. County of Allegheny*, 633 A.2d 1325, 1329 n.11 (Pa. Cmwlth. 1993). The burden of persuasion never leaves the proponent of the order, but the burden of production may shift during the proceedings. *Id.* If the proponent of the order makes out its *prima facie* case, the burden shifts to the opposing party to present evidence that balances the evidence presented, and, if it does so, the moving party has not met its burden and must provide additional evidence to support the claim. *Milkie v. Pa. Pub. Util. Comm'n*, 768 A.2d 1217, 1220 (Pa. Cmwlth. 2001).

> B. *Whether the Commission erred and/or abused its discretion in holding that MetEd was authorized and obligated to provide electric services to Librandi*

> 1. Parties' Arguments

The Borough[9] argues the Commission erred in holding, based either on its erroneous interpretation of the 1923 CPC or on other, i.e., grandfathered, authority, that MetEd is authorized to provide electric service to Librandi in the Borough without the Borough's consent. The Borough argues that prior to 1914, the services and territory of a utility were based on a utility's articles of incorporation, which were then preserved by Section 103(a) of the Code and its predecessors. According to the Borough, there are no pre-1914 charters in the record of MetEd, or any of its predecessors, that would authorize service in the area in which Librandi is located, i.e., SARAA. The Borough posits that, since 1914, authority for a service territory has had to be found within a CPC issued by the Commission (or its predecessor) and

---

[9] The Pennsylvania Municipal Electric Association (PMEA), a non-profit trade association representing the interests of 35 boroughs that own and operate electrical systems, filed a brief in support of the Borough.

15

additional CPCs must be issued if new or additional territory is added. It is the CPC, the Borough asserts, that makes it lawful for a public utility to provide service to a particular territory. *Lukens Steel Co. v. Pa. Pub. Util. Comm'n*, 499 A.2d 1134 (Pa. Cmwlth. 1985). The Borough argues that neither the 1923 CPC nor the 1924 CPC authorize the provision of electric services within the Borough without the Borough's prior consent and, therefore, cannot be the bases for the Commission's decision. Nor are there any CPCs in the record that authorize MetEd to provide service on any part of the land on which Librandi is located, such as Commission-approval of MetEd's 1968 acquisition of the electric distribution facilities on Olmsted AFB, which would extend its service territory to include that area. Any reliance by the Commission on anything other than a pre-1914 charter or CPC, such as a utility's tariff, or the unauthorized service to Librandi between 1994 and 1997 and others in the Borough, to provide MetEd authority to provide service to Librandi, is erroneous.

MetEd argues the Commission erred in finding that it has an unconditional right and duty to serve Librandi notwithstanding the limitation imposed in the 1923 CPC requiring MetEd to obtain the Borough's permission to provide service in the Borough. Those limitations control, and the Commission's attempt to set them aside, under the auspices of grandfathered authority, is contrary to the Code and precedent. MetEd asserts the Commission's conclusion that MetEd acquired grandfathered rights to serve customers on SARAA Property is in error because, among other reasons, only a "public utility" has grandfathered rights under Section 103(a) of the Code or its predecessor laws, and non-public utilities operating at that time would not receive any such rights. Here, MetEd maintains, the alleged grandfathered rights are premised on the rights acquired by MetEd from a non-public

16

utility entity, the Commonwealth, which had been acquired from another non-public utility entity, the federal government. As neither the Commonwealth nor the federal government were public utilities as defined by the Code, MetEd argues, their right to operate the internal electric facilities thereon **for themselves** could not be grandfathered under Section 103(a) of the Code and passed onto MetEd.

MetEd further asserts that since 1914, a public utility must apply for and receive a CPC, upon which the Commission could impose conditions, before serving customers in areas outside its chartered or certificated territory. Both the utility and the Commission are bound by the conditions in a CPC, and, in this matter, the Commission did not follow the conditions imposed in the 1923 CPC. MetEd contends no public utility can acquire rights that supersede conditions imposed on a CPC without obtaining Commission approval, which did not occur here, and, thus, the 1923 CPC controls. Like the Borough, MetEd asserts its tariff, while binding and having the force and effect of law, cannot expand the territory of a utility by including an area not set forth in its CPC.

The Commission argues it did not err or abuse its discretion in granting the Petition and resolving the controversy of whether Librandi could obtain electric service from MetEd and whether MetEd was authorized to provide such service to Librandi. According to the Commission, it properly determined that MetEd's acquisition of Olmsted AFB's electric distribution facilities, which operated as early as 1898, followed by MetEd's use of those facilities to provide public utility service resulted in those facilities becoming "public utility facilities" subject to the Code and the Commission's regulation. It notes that the electric distribution facilities for the SARAA Property have been owned and used to provide public utility services in the Borough by an entity other than the Borough since 1898. The Commission

17

asserts that preservation provisions in Section 103(a) of the Code support its conclusion that MetEd has the authority to provide Librandi service based on grandfathered or legacy rights. According to the Commission, this conclusion is further supported by MetEd's tariff, its previous provision of services to Librandi, and its current provision of services to customers on the SARAA Property. The Commission argues it did not disregard the 1923 CPC or the 1924 CPC, but interpreted those documents in light of the existence of overlapping authority where MetEd would not be introducing electric service or serving an area other than the SARAA Property, on which electric distribution facilities predated those CPCs. Finally, the Commission asserts its findings regarding the acquisition of Olmsted AFB's distribution facilities, MetEd's provision of service to Librandi, the Borough's provision of service to Librandi, the language of the 1923 and 1924 CPCs, MetEd's tariff's service territory, and MetEd's provision of service to two customers within the Borough are supported by substantial evidence. (R.R. at 14a-15a, 41a, 58a-60a, 95a-96a, 145a-46a, 282a-83a, 347a-56a, 426a, 514a-15a.)

Librandi argues the Commission correctly determined that the SARAA Property is within MetEd's service territory, and that the electric distribution facilities on the SARAA Property have been in continuous use and operation since at least 1898 and predate the 1923 CPC. Librandi asserts the 1923 CPC requires approval of the Commission and the Borough "hereafter" to furnish service to consumers within the Borough, and electric service was being furnished on what would become the SARAA Property prior to the 1923 CPC. According to Librandi, MetEd's and the Borough's arguments that MetEd cannot serve Librandi in the absence of a CPC or charter rights ignore the undisputed facts and the existence of legacy rights under the Code. Librandi asserts that arguments that the legacy rights

18

of non-public utilities should not be recognized, because they were provided internally by government agencies, are "hyper-technical" and ignore the nature of the rights of MetEd's predecessors on the SARAA Property. (Librandi's Brief (Br.) at 27, 29.) The purpose of Section 103(a), Librandi asserts, is to preserve the rights that existed prior to the regulation of utilities to continue operating as they were. Because MetEd acquired and has continued to provide EDS to customers on the SARAA Property on facilities that pre-date the regulation of public utilities, Librandi argues MetEd has the authority to provide Librandi with EDS now.

The Borough responds, reiterating that there is no present and existing authorization documentation and, therefore, no lawful certificated area for MetEd to operate within the Borough. It asserts the 1923 CPC does not authorize service to Librandi absent Borough consent, and, therefore, Librandi could not meet its *prima facie* case of showing that MetEd is authorized to provide it service. According to the Borough, actions outside a valid authorization document cannot be used to establish a right to provide service, a principle ignored by the Commission and called hyper-technical by Librandi. The Borough reiterates its position that MetEd's acquisition of the Olmsted AFB's distribution facilities did not provide it with any rights to serve customers in the Borough, nor does MetEd's tariffs.

MetEd responds that the Commission and Librandi conflate grandfathered rights and *de facto* public utilities, which are different legal principles, with the former authorized by Section 103(a) of the Code, and the latter resolved through obtaining a CPC. As any right MetEd acquired through its operation of the Olmsted AFB facility would be based on a *de facto* operation, that is, operating without a CPC encompassing that area, it is not a "lawful" right that can be grandfathered under Section 103(a) of the Code. MetEd reiterates that the Commission's reliance

19

on the identification of the Borough in its tariff is misplaced because there is no such thing as a tariffed service territory and a utility's service territory is established by its CPC, not its tariff.

## 2. Analysis

At issue is whether MetEd has the authority to provide EDS to Librandi without the Borough's consent. The Commission concluded that MetEd "is authorized **pursuant to its present and existing [CPC]** to provide electric utility service to facilities situated and located on property leased from the" SARAA. (Commission Order ¶ 1(a) (emphasis added).) The Borough and MetEd argue this conclusion is in error because there is **no CPC** that authorizes MetEd to provide the requested service to Librandi without the Borough's consent and the Commission's reliance on other alleged authority, namely MetEd's tariff and the asserted legacy or grandfathered authority obtained via MetEd's purchase of the Olmsted AFB's electric distribution facilities, is misplaced. Upon review, we agree.

The Commission has jurisdiction to determine a public utility's authority under its CPC, as well as its "rights to serve [a] particular territory" or obtain "any right, power, privilege, service, franchise[,] or property." *Borough of Lansdale*, 170 A.2d at 567. The extent of a public utility's authority, as well as the territory in which that authority can be exercised, is established in its CPC. *Lukens Steel Co.*, 499 A.2d at 1136 n.1. A public utility has "an obligation to provide service in that territory." *Id.* "[T]he type of service contemplated at the time of the original application is a significant consideration." *Purolator Sec., Inc. v. Pa. Pub. Util. Comm'n*, 378 A.2d 1020, 1022 (Pa. Cmwlth. 1977). *See also* Section 1103(a) of the Code, 66 Pa.C.S. § 1103(a) ("Any holder of a [CPC], **exercising the authority conferred by such certificate**, shall be deemed to have waived any and all

20

objections to the terms and conditions of such certificate.") (emphasis added). The authority found in a CPC "may not be enlarged by *ex parte* action on the part of the holder thereof." *Makovsky Bros., Inc. v. Pa. Pub. Util. Comm'n*, 423 A.2d 1089, 1092 (Pa. Cmwlth. 1980).

There can be no reasonable dispute that the 1923 CPC issued to MetEd's predecessors in interest, and acquired by MetEd via the 1924 CPC, does not support the Commission's determination that MetEd is authorized to provide Librandi service under that authority. The 1923 CPC relevantly states: "the Metropolitan-Middletown Electric Company, its successors and assigns, **shall not without the approval of the Commission and the consent of the Borough** . . . hereafter first had and obtained, furnish service to any consumer or consumers **within its corporate district or territory** . . . ." (R.R. at 298a (emphasis added).) Notably, neither the Commission nor Librandi rely on the 1923 CPC as the basis for MetEd's authority to provide service to Librandi. Rather, they assert MetEd has the authority **notwithstanding** the language of the 1923 CPC because MetEd's tariff references rates for customers in the Borough and MetEd acquired legacy or grandfathered rights when it acquired the Olmsted AFB electric distribution facilities. We disagree that either of these sources provide legal support necessary for affirming the Commission's grant of the Petition.

A tariff does not establish a public utility's authority to offer service in a particular area – that is established in the utility's CPC. Rather, a public utility's tariff is "[a]ll schedules of rates, all rules, regulations, practices, or contracts involving any rate or rates, including contracts for interchange of service . . . ." Section 102 of the Code, 66 Pa.C.S. § 102. "A tariff is a set of operating rules imposed by the [Commonwealth] that a public utility must follow if it wishes to

21

provide services to customers." *PPL Elec. Utils. Corp. v. Pa. Pub. Util. Comm'n*, 912 A.2d 386, 402 (Pa. Cmwlth. 2006). The Commission relied on the presence of a rate for customers located within the Borough in MetEd's tariff as *prima facie* evidence that, as a matter of law, MetEd was authorized to provide service to properties within the Borough, which the Commission appears to conclude includes all properties that were also attached to Olmsted AFB. (Op. & Order at 60-61.) However, this reliance is misplaced because, as stated, the 1923 CPC and 1924 CPC provide MetEd with the authority to provide service in the Borough, but that service was not absolute and is subject to the consent of the Borough. Thus, the references to rates for Borough customers in MetEd's tariff are not evidence of MetEd's authority to act beyond the terms of the 1923 CPC, which is how the Commission read the tariff.

This leaves the Commission's conclusion, based on Section 103(a) of the Code, that MetEd acquired the legacy or grandfathered rights and authority of the federal government related to its operation of an electric distribution system on Olmsted AFB, which, in its view, would authorize MetEd to provide EDS to Librandi without the Borough's consent. (*Id.* at 66-68, 71.) If MetEd had rights that preexisted the 1923 CPC, the Commission and Librandi reason, the 1923 CPC does not preclude MetEd from providing services to Librandi because the restriction contained there relates to services "[h]ereafter first had and obtained," in the Borough's territorial limits, (R.R. at 298a), i.e., only those services being introduced to the Borough after the approval of the 1923 CPC, (Op. & Order at 64-65, 70). Reviewing Section 103(a), as well as the former public utility laws of this Commonwealth, and precedent, we disagree that MetEd acquired any legacy rights when it acquired the electric distribution facilities of Olmsted AFB.

The concept of legacy or grandfathered rights has existed since the enactment of legislation governing and regulating public utility services in Pennsylvania. "[A]rticle 3, section 12[] of the Public Service Company Law [(Public Service Law)], approved July 26, 1913, P.L. 1374[, *formerly*] 66 P[.]S[.] § 311[],"[10] provided that "'[e]**very public service company** shall be entitled to the full enjoyment and exercise of all and every the rights, powers, and privileges [sic] which it lawfully possesses, or might possess, at the time of the passage of this act, except as herein otherwise expressly provided.'" *Whinney v. Pub. Serv. Comm'n*, 176 A. 753, 754 (Pa. Super. 1935) (emphasis added). The Public Service Law came into effect on January 1, 1914. *Id.* at 755. Under this provision, a public service corporation could continue to exercise the chartered powers it had prior to January 1, 1914, within the area it was providing service "without permission of the [C]ommission; but any extension of that exercise . . . c[ould] only be begun after [it] ha[d] applied to the [C]ommission and secured its [CPC], in accordance with the provisions of the act." *Id. See also Hostetter v. Pub. Serv. Comm'n*, 168 A. 493, 494 (Pa. Super. 1933) (same); *Harmony Elec. Co. v. Pub. Serv. Comm'n*, 78 Pa.Super. 271, 280, 283 (1922) (holding the Public Service Law "specifically reserves to every public service company" these rights).

Section 1401 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended*, *formerly* 66 P.S. § 1531,[11] provided a similar grandfather clause. Like that in the Public Service Law, this provision has been interpreted as "recogniz[ing a utility's] right to institute service in a given chartered area [that existed prior to 1914] without specific approval of the [C]ommission." *Dublin Water Co. v. Pa. Pub. Util. Comm'n*, 213 A.2d 139, 142 (Pa. Super. 1965). In *Dublin Water Company*, the court

---

[10] The Public Service Law was repealed by the Act of May 28, 1937, P.L. 1053.

[11] The Public Utility Law was repealed by the Act of July 1, 1978, P.L. 598.

23

explained "[t]he law is settled that older non-carrier **public utilities** are vested with service rights throughout their charter territories which are not dependent upon the existence of facilities or the extent of service therein prior to the advent of the Public Service [] [L]aw in 1914." *Id.* at 143 (emphasis added).

Most recently, Section 103(a) of the Code reiterates the prior statutory provisions outlining the scope of the grandfather clause. Section 103(a) provides, in relevant part:

> **Existing law continued.** --Except as otherwise specifically provided in this part, it is the intention of this part to continue existing law. **Any public utility . . . rendering service or having the right to render service on the day preceding the effective date** of this part **shall be entitled to the full enjoyment and the exercise of all and every right, power and privilege which it lawfully possessed on that date**.

66 Pa.C.S. § 103(a) (emphasis added).

Consistent throughout these statutory provisions is the invocation of the term "public service corporation" or "public utility" to identify what entity's rights will continue after the enactment of the relevant law. These terms have meaning, and our Supreme Court has explained the difference between a "public utility" and a "private utility" as being whether the entity furnishes a service, such as electricity or water, "**to or for the public** for compensation." *Drexelbrook Assocs. v. Pa. Pub. Util. Comm'n*, 212 A.2d 237, 239 (Pa. 1965) (emphasis in original). It held "[t]he public or private character of the enterprise does not depend . . . upon the number of persons by whom it is used, but upon whether or not it is open to the use and service **of all members of the public** who may require it." *Id.* at 239 (emphasis and alterations in original) (citation omitted). It is "**only** where the service involved is rendered to or for the public" that the Commission has jurisdiction. *Id.* at 242 (emphasis in original) (internal quotation marks omitted). The Superior Court

applied a similar analysis to distinguish a public service corporation from a private entity, concluding it was "the readiness [of an entity] to serve all members of the public to the extent of capacity" by holding itself "out, expressly or impliedly, as engaged in the business of supplying [its] . . . service to the public" rather than "holding [itself] out as serving or ready to serve only particular individuals." *Brink's Ex. Co. v. Pub. Serv. Comm'n*, 178 A. 346, 348-49 (Pa. Super. 1935) (internal quotation marks omitted). In contrast, an entity that is not engaged in the business of providing a service, such as water, to the public at large, is not a public service corporation. *Borough of Ambridge v. Pub. Serv. Comm'n*, 165 A. 47, 49 (Pa. Super. 1933). Section 102 of the Code similarly excludes from the definition of "[p]ublic utility" any entity that provides electric service or an internal distribution system for its own use.[12] 66 Pa.C.S. § 102. Ultimately, "[i]t is the character of [the] service which [an entity] renders which determines its status" as either providing a public service or a private service. *Borough of Ambridge*, 165 A. at 49.

Here, the Commission acknowledged that the electric distribution facilities at Olmsted AFB, owned and operated by the federal government, were not for the public, but for the base's internal use. (Op. & Order at 19, 50.) Thus, under the above precedent, neither the federal government nor the Commonwealth could be categorized, as a matter of law, as a public service corporation or public utility, which has been a requirement for the application of the grandfather clauses of Pennsylvania utility laws since their inception. Although Librandi characterizes reading Section 103(a) as applying only to the rights, powers, and privileges that

---

[12] The Code excludes from the definition of "[p]ublic utility" "[a]ny person or corporation, not otherwise a public utility, who or which furnishes only to himself or itself," as well as "[a]ny building or facility owner/operators who hold ownership over and manage the internal distribution system serving such building or facility and who supply electric power and other related electric power services to occupants of the building or facility." 66 Pa.C.S. § 102.

belong to a public utility as being hyper-technical, this reading is supported by the plain language of Section 103(a).

The object of statutory interpretation is to ascertain and give effect to the intent of the General Assembly, and where the language of a statute is unambiguous, that language is the best indicator of that intent. Section 1921(a), (b) of the Statutory Construction Act of 1972 (SCA), 1 Pa.C.S. § 1921(a), (b); *Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 674 (Pa. 2020). In enacting the various grandfather clauses in the Public Service Law, the Public Utility Law, and, finally, the Code, the General Assembly specifically identified the rights, authority, and power that would be grandfathered – it was the rights, authority, and power of **public utilities** that had existed prior to the enactment of the Public Service Law, the Public Utility Law, and, later, the Code, that would remain in effect. Relying on the plain language of a statute is not relying on hyper-technicalities; it is how the Court is to ascertain the meaning of that language, and unambiguous language "is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(a), (b). As the preexisting provision of EDS on Olmsted AFB upon which Librandi and the Commission rely as the basis of MetEd's legacy rights to provide service beyond that provided in the 1923 CPC were not those of a public utility, the Commission erred in relying on Section 103(a) to grant the Petition.

Finally, we must note the Commission's holding would result in MetEd altering its Commission-approved authority via a private contract to purchase the facilities of Olmsted AFB. It is well settled that a utility cannot divest itself of its service or **alter its authority via private contract**. *Lackawaxen Water & Sewer v. Pa. Pub. Util. Co.*, 481 A.2d 1386, 1389 (Pa. Cmwlth. 1984). At its essence, the Commission's interpretation of Section 103(a) allows MetEd to **expand its**

26

**certificated authority** beyond that expressly set forth in the 1923 CPC **by entering into a private contract** with a non-public utility, the Commonwealth, to purchase the non-public utility's facilities. The error was repeated in the Commission's conclusion that, notwithstanding the lack of a CPC covering the acquired electric distribution facilities and expanded territory, i.e., territory not contained in the 1923 CPC, the acquired non-public utility facilities **became public utility facilities** that could be subject to Section 103(a) and be put to use beyond the authority granted in the 1923 CPC by virtue of MetEd's acquisition. (Op. & Order at 61.) These interpretations are not consistent with the Code or with the principle that a "[CPC] may not be enlarged by *ex parte* action on the part of the holder thereof." *Makovsky Bros., Inc.*, 423 A.2d at 1092.

## III. CONCLUSION

For the foregoing reasons, the Commission erred when it concluded that Librandi had the right to obtain EDS from MetEd based on MetEd having the authority to provide such services under its current or preexisting CPCs or by virtue of MetEd's acquisition of grandfathered or legacy rights when it acquired the electric distribution facilities of the former Olmsted AFB. Accordingly, we reverse.[13]

---

**RENÉE COHN JUBELIRER,** President Judge

Judge Fizzano Cannon did not participate in the decision in this case.

---

[13] Because of our disposition, we do not address whether the Commission erred or abused its discretion in concluding that allowing Librandi to obtain EDS from MetEd would result in the unnecessary duplication of services or direct competition between MetEd and the Borough.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Middletown,                                      :
                              Petitioner              :
                                          :
                   v.                                  :    No. 1450 C.D. 2021
                                          :
Pennsylvania Public Utility                          :
Commission,                                              :
                              Respondent            :


Metropolitan Edison Company,                    :
                              Petitioner              :
                                          :
                   v.                                  :    No. 36 C.D. 2022
                                          :
Pennsylvania Public Utility                          :
Commission,                                              :
                              Respondent            :

## O R D E R

NOW, August 7, 2023, the Order of the Pennsylvania Public Utility Commission entered in the above-captioned matter is hereby **REVERSED**.

 

**RENÉE COHN JUBELIRER,** President Judge